## JOSEPH J. HARBACEK, Appellant, v. FULTON IRON WORKS COMPANY and JAMES B. DUNCAN.

Division One, April 9, 1921.

1. **CONTRIBUTORY NEGLIGENCE: Definition.** Contributory negligence rests on tort, and is the lack of that ordinary care on the part of a plaintiff which directly contributes to cause. or causes his injury.

2. **ASSUMPTION OF RISK: Definition.** Assumption of risk is generally limited to the relation of master and servant, and rests upon contract, either express or implied. It is a separate and distinct defense from contributory negligence, and is differently applied.

3. **PERSONAL INJURIES: Negligence: Failure of Proof.** Where the specific act of negligence charged in the petition was that defendant failed to furnish plaintiff with goggles to protect his eyes while chipping iron with a cold chisel, and the proof was that plaintiff was an experienced workman, knew the use of goggles, saw other men about the premises at the same kind of work using goggles, had been told by the foreman that defendant had in the tool room everything that pertained to the job, had in fact for four months been getting his tools from that room, but had never asked for goggles, *held*, that the proof did not support the charge and the plaintiff was properly non-suited.

4. ——: **Assumption of Risk.** Where the plaintiffs' own evidence showed that the flying of chips or particles of iron from castings when excrescences were chipped off with a chisel was a usual and obvious risk incident to the business, and that plaintiff, an experienced workman, knew this and knew the danger to his eyes, *held*, that he assumed the risk when he entered and continued in the employment of the defendant, and could not recover damages for the loss of an eye.

Appeal from St. Louis City Circuit Court.—*Hon. Frank Landwehr*, Judge.

AFFIRMED.

*W. H. Douglass* for appellant.

(1) Defendant's foreman was bound to know or at least should have anticipated that particles of iron chipped by plaintiff from castings while in the performance of his duty were apt to strike him in the eyes, un-

less his eyes were protected, and it was the duty of defendant to furnish plaintiff with goggles, the only known appliance, to protect his eyes.   3 Thompson on Negligence, sec. 3969; Curtwright v. Ruehlmann, 181 Mo. App. 557; Herdler v. Stove & Range Co., 136 Mo. 3; Smith v. Lidgerwood Mfg. Co., 67 N. Y. Supp. 533, 56 N. Y. App. Div. 528; Choate v. Rolling Mills, 27 Ont. App. 155; Thein v. Supply Co., 116 Mo. App. 1.   (2). If it was negligence on the part of the defendant to fail to furnish plaintiff with goggles, then plaintiff did not assume the risk and injury as the servant never assumes a risk of injury caused by the negligence of the master.   Williams v. Prior, 272 Mo. 613; Fisk v. Railroad, 263 Mo. 106; Patrum v. Railroad, 259 Mo. 109.   (3)   Plaintiff was not guilty of contributory negligence in continuing to do the work of chipping without goggles, as the danger was not so open and obvious that a reasonably prudent man would refuse to do the work.   Jewell v. Bolt & Nut Co., 231 Mo. 176.

*Leigh C. Turner, W. E. Moser* and *Kelley & Starke* for respondents.

(1)   The court properly sustained defendants' demurrers, because the only allegation of negligence contained in plaintiff's petition upon which recovery could be predicated was  not proven by any evidence adduced upon plaintiff's behalf.   (2)   Under the undisputed and uncontradicted facts in this case, plaintiff assumed the risk of being injured by flying pieces of metal, which was a risk incident to the work in which he was engaged. Johnson v. Brick & Coal Co., 276 Mo. 42; Patrum v. Railroad, 259 Mo. 109; Chrismer v. Bell Tel. Co., 194 Mo. 189; Powers v. Loose-Wiles Co., 195 Mo. App. 430.

ELDER, J.—This is an action brought by plaintiff to recover damages for an injury to his eye, sustained while employed by defendant Fulton Iron Works Company.   James B. Duncan, general foreman of the company is joined as a defendant.

At the close of the evidence in behalf of plaintiff, upon the request of both defendants the trial court gave

as to each defendant an instruction in the nature of a demurrer to the evidence, the same being as follows: "At the close of plaintiff's evidence, the court instructs the jury that under the law and the evidence your verdict must be in favor of defendant." Plaintiff thereupon took an involuntary nonsuit as to both defendants, with leave to move to set the same aside. Thereafter, in due time, plaintiff filed his motion to set aside the nonsuit taken. Said motion being overruled, he took an appeal to this court.

The facts, as developed by the testimony offered by plaintiff are as follows: The defendant Fulton Iron Works Company conducts a large iron foundry and steel plant in St. Louis County, of which defendant Duncan is general foreman. Plaintiff testified on direct examination that he was 37 years old; that he worked for the defendant Iron Company from the latter part of March, 1918, until June 20, 1918, the day upon which he was injured; that he was employed as a floor machinist and that his work was to assemble and erect sugar mills, fitting parts and putting them together on the floor of the machine shop; that this floor was about 80 feet square and there were about seventy men in the same room, engaged in the same kind of work he was doing; that at the time he was injured he was fitting a dust guard over a roller which grinds the cane, said guard being formed like a half cylinder, and being about three feet long, eight inches wide and five-eighths of an inch thick. Plaintiff stated that when a guard was placed and it did not fit, it was his duty to chip it and make it fit, the chipping being done with a cold chisel and a hammer by taking the chisel in his left hand, placing it the way he wanted it, and striking the head of the chisel with the hammer held in his right hand; that some days he had to do more chipping than others, that there were days when he did none at all, but that on the average he chipped about three hours a day; that in this instance he was working with a man named Ed Kerns and had been instructed to do the particular chipping by Mr.

287  Mo.—31

Grier assistant to defendant Duncan; that he did not know how long he had chipped on the dust guard in question, but that after he had made a few licks, a piece from the casting he was chipping flew in his right eye; that after the piece of metal struck his eye his fellow-workman Kerns came up and opened his eye and the piece of metal fell out; that after the accident a doctor was called, who looked at the eye and sent him to Doctor Henderson who treated it, after which he went to the office of Dr. Briggs, who took an X-ray picture; that he suffered pain for about six months and that Dr. Henderson treated the eye from the day of the injury until about April, 1919, removing the eye in February, 1919. He further stated that when he was doing chipping, particles chipped off would fly in all directions and you could never tell where they were going to fly; that these pieces had struck him on different parts of the body and he thought that some of them had struck him in the face; that he wore nothing over his eyes while he was chipping; that he never saw any of the floor machinists who did the same work as he was doing wear goggles; that no one told him that there were any goggles there for him to wear while he was chipping; that there were men who worked out in the yard at the plant called "steady chippers," they doing the same work all the time, and that they wore goggles while at work. During the direct examination counsel for plaintiff offered to show by him that since the injury plaintiff had made an effort to get work as a machinist, but that he had been refused because of the fact that he had but one eye. Counsel for defendant objected and the objection was sustained.

On cross-examination, plaintiff testified that he had been working for the defendant Iron Company three or four months before the day he was hurt; that before he began work there he had worked for the Diesel Engine Company, before that for the Cabanne Motor Car Company, and before that for the Dorris Automobile Company, having been a machinist and having handled machinery at

all those places; that he had been a machinist for five years before going to work for the defendant company and was experienced in that line of work, having so told defendant Duncan at the time he was employed; that when he went to work for the defendant company he knew that he would be required to do some chipping and during all the time that he was employed he did chipping to make castings fit on sugar machines; that Mr. Grier told him, when he first went to work for the defendant company, where the tool room was and had given him checks for the purpose of going to the tool room and obtaining tools; that when he would return the tools to the tool room he would receive these checks back; that in chipping he would measure off the part that was a little too large and that he wanted to chip off or cut off and then with a cold chisel in the left hand and a hammer in the right, would do the chipping; that he selected the place he wanted to chip off and where he wanted to place the blade of the chisel against; that he knew all the time he was employed by the company that, when he set a cold chisel against metal and hit the head of the chisel with the hammer, pieces of iron would fly off, and that he knew that fact before he began work for the company; that he also knew before he went to defendant's plant, and during all the time that he worked there, that he could not tell in which direction the pieces of iron were going to fly and that he had no control of the direction in which the small pieces would fly; that he knew that if one of these pieces struck him in the eye it would hurt his eye; that there was no foreman present directing him where to place the chisel; that before the accident he had chipped similar metal of the kind he was working on when injured; that he had chipped the day before the day of the accident and had no trouble; that the hammer and chisel he was using were all right; that he did not know whether they had goggles in the tool house or not, because he had never asked for any; that he saw other men who were "steady chippers" at defendant's plant wearing goggles all the time that he was employed there; that he knew what gog-

gles were for and knew it when he was employed at defendant's plant; that he knew they were to keep things from getting in the eye, but never asked for goggles while he was there; that he never made any complaint to any one in authority for the defendant company at any time that he wanted or needed goggles; that he did not think it was necessary for him to use goggles when he was chipping.

On re-examination, plaintiff testified that when defendant Duncan hired him, he did not tell plaintiff that they had hammers, chisels, saws, files and all those kind of tools, but he knew that they had tools or they could not run the place; that defendant Duncan and Mr. Grier told him that they had anything that pertained to the job.

John Nieman testified on direct examination that he was then and had been employed by the defendant company for two and a half years; that he did chipping; that no goggles were furnished to the floor machinists that he knew of; that he did not see any machinists doing the work which plaintiff did wearing goggles while they were chipping; that he did not know whether they had goggles in the tool house or not; that he had chipped and fitted parts for the American Steel Foundry and was furnished goggles there. On cross-examination, the witness testified that he had never gone to the tool house and asked for goggles; that he saw that chippers in the yard used goggles; that after plaintiff was injured the defendant company compelled him to wear goggles which he obtained from the tool house.

Edw. A. Kerns testified that he was working for the defendant company as a floor machinist on the day plaintiff was injured and was close to him at the time of the accident; that he heard plaintiff make a noise, went over to him and saw a chip in his eye; that he had been doing the same kind of work about a year and a half before the accident to plaintiff occurred and never saw any of the machinists wearing goggles while they were chipping. On cross-examination the witness stated that he did not know whether there were any goggles in the tool house or not

and that he had never asked for goggles; that he wore goggles sometimes; that he wore glasses, both for the pur⸗ pose of seeing better and of protecting his eyes; that he never heard plaintiff complain to anyone that he wanted goggles or needed them; that on a previous trial of the case he had testified that there were a few of the men who did steady chipping that wore goggles.

The foregoing outlines the case made.

The specific allegation of negligence pleaded by plaintiff is thus stated in the petition:

"Plaintiff further says that said injuries were directly caused on account of the negligence of the defendants in failing to furnish plaintiff a reasonably safe place in which to work and reasonable safe tools and appliances with which to work in this, to-wit: That defendants knew or by the exercise of ordinary care could have known or should have anticipated that particles of steel when chipped by plaintiff were apt to strike plaintiff in the eye and injure it and had the defendants exercised ordinary care for the safety of plaintiff they would have provided him with goggles, or furnished him other means or method of protecting his eyes from pieces of iron chipped off as aforesaid."

The answer of defendant Fulton Iron Works Company was a general denial, coupled with a plea of contributory negligence, as follows:

"That at and prior to the time when plaintiff is alleged to have been injured defendant furnished to plaintiff and other employees, engaged in chipping iron, goggles which were convenient and accessible to plaintiff and which were adequate and sufficient to protect the eyes of plaintiff and other employees against injury, and that plaintiff was directed and instructed always to wear said goggles while chipping iron, but defendant avers that on said occasion plaintiff, in violation of said orders and instructions, negligently and carelessly failed and omitted to wear said goggles or ask for the same. And defendant states that said acts of negligence and carelessness on the part of plaintiff directly contributed to

cause whatever injuries, if any, were sustained by him on said occassion.'' The answer of defendant Duncan was a general denial.

I.   Plaintiff assigns as errors the action of the trial court: (1) In holding that plaintiff was guilty of contributory negligence as a matter of law; (2) in sustaining defendants' demurrers to the evidence; (3) in rejecting testimony offered by plaintiff; (4) in overruling plaintiff's motion to set aside the involuntary nonsuit.

Assignments.

An examination of these assignments of error in the light of the pleadings and evidence adduced, demonstrates that the real questions are: First, Was the negligence of defendants in failing to provide plaintiff with goggles shown by the proof? and, second, Did plaintiff assume the risk of being injured by flying pieces of metal? If the demurrers were rightly sustained, it must have been upon the ground that, as a matter of law, no negligence of defendants was shown, or, that, as a matter of law, plaintiff assumed the risk.

II.   Learned counsel for plaintiff, in his brief, seems to assume that the trial court sustained defendants' demurrers upon the theory that plaintiff was guilty of contributory negligence.   However, a careful reading of the record shows that there is nothing contained therein which indicates that the demurrers were sustained on that ground.   The record is silent as to upon what ground the court acted.   While defendant Fulton Iron Works pleaded contributory negligence in its answer, in this court both defendants urged that plaintiff assumed the risk of being injured, this we presume on account of the construction placed by them upon the evidence adduced at the trial.

Contributory Negligence: Assumption of Risks.

While some confusion has arisen in the discussion of the doctrines of contributory negligence and assumption of risk, and while it is sometimes difficult to draw the line of demarcation between them, nevertheless, it is the set-

tled law of this State that these two defenses are separate and distinct and are differently applied. Contributory negligence may be said to be that negligence, or want of ordinary care, on the part of a plaintiff which directly contributes to or causes his injuries. It rests on, and is applicable in actions of tort. Assumption of risk is generally limited to the relation of master and servant and rests upon contract, either express or implied. [Fish v. Railroad, 263 Mo. 124.] In the case of master and servant, contributory negligence, while it implies negligence in the master, further consists in the performance by the servant of some negligent act, or the negligent omission to perform some duty, which materially contributes to, and, in conjunction with the negligence of the master, constitutes one of the elements of, the proximate cause of the injury to the servant. On the other hand, assumption of risk does not involve the negligence of the master, but consists in an ordinarily prudent servant, voluntarily for hire, taking the chances of known or obvious dangers incident to his employment by the master. As was said by Valliant, J., in Curtis v. McNair, 173 Mo. l. c. 281, in distinguishing the two doctrines upon a question of pleading: "If the plaintiff's suffering was solely from a risk incident to the business, he cannot recover because it was a risk he assumed when he undertook the service, and this fact the defendant may show under his plea of general denial, because by so showing he disproves the allegation of negligence on his part. A special plea that plaintiff assumed such risk is unnecessary. But if the defect in the machinery is obvious or is known, or by the exercise on his part of ordinary care would have been known, to the servant who continued, nevertheless, to use it until the accident occurred, those facts may be pleaded as going to constitute contributory negligence, and in such case if the issue so tendered is found for the defendant, the plaintiff cannot recover, not because he has assumed the risk of his master's negligence, but because notwithstanding the negligence of his master, the law will not allow him to recover when his

own negligence has contributed to the result.'' And enlarging upon the difference further, as expressed by FARIS, J., in Patrum v. Railroad, 259 Mo. l. c. 121: ''We have here in Missouri, whether logically or illogically we need not here pause to discuss, come to use the term 'assumption of risk' to express the mere hazards which appertain to a dangerous avocation when unaffected by the negligence of the master. When, however, the servant enters into or remains in the service of the master with actual or constructive knowledge of defects arising from the master's negligence and without a promise of remedy, we speak of this in our Missouri courts as contributory negligence.''

With these principles in mind, upon approaching the questions before us, we find at the outset that plaintiff in his petition charges that ''had the defendants exercised ordinary care for the safety of plaintiff *they would have provided him with goggles* or furnished him other means or method of protecting his eyes from pieces of iron chipped off as aforesaid.'' Plaintiff, in his brief, admits that goggles are the only known appliance to protect the eyes and consequently the device for safety which should have been furnished by defendants will be considered as limited to goggles. Furthermore, a proper construction of the language used in the charge would limit the appliance to goggles. Therefore, the negligence attributed to defendants was a failure to provide plaintiff with goggles. Let us then proceed to a consideration of the evidence bearing upon that question in order to determine whether such negligence was proven.

Plaintiff, on direct examination, testified that while he was working for defendant Fulton Iron Works he never saw any of the floor machinists doing the work that he was engaged in wear goggles while they were chipping; that no one ever informed him whether or not there were any goggles to wear while he was chipping; that ''there were other men that worked out in the yard at the Fulton Iron Works that did chipping besides the floor machinists. They

*Safe Tools.*

were what they call 'steady chippers.' They do the same work day in and day out. They wore goggles for their eyes while they did this work." On cross-examination, he testified: "I saw other chippers at work in the yard under another boss in the plant of the Fulton Iron Works. They were steady chippers and wore goggles. I saw them during all the time I was there. I knew what the goggles were for and knew it when I went out there. I never asked anybody for goggles while I was there. When Mr. Duncan hired me he did not tell me to get goggles down at the tool house. I never asked the tool house man for goggles." On being asked, "Now, you don't know whether they had goggles in the tool house or not because you never asked for any, did you?" he replied, "No, sir." Further, he said, "I saw a man away up in the corner in the room where I was that ran an emery wheel wear goggles." On re-direct examination, on being asked, "Did anyone at the Fulton Iron Works in authority ever suggest to you that you ought to wear goggles?" he replied, over an objection by counsel for defendant which was overruled, "No, sir." On re-cross examination, he said, that when first employed "they told me they had anything that pertained to the job."

John Nieman, witness for plaintiff, testified on direct examination, that no goggles were furnished to floor machinists. On cross-examination he said, "I never went to the tool house and asked for goggles. I don't know whether they had any goggles in the tool house or not. I saw other chippers out in the yard use them." And, "I never saw the emery wheel man on the floor where we were use them."

Edward A. Kerns, witness for plaintiff, testified on direct examination that no one ever told him that there were goggles in the tool house which he could use if he wanted them. On cross-examination he testified as follows:

"Q. Did you see any machinists who did the same kind of work that you and Mr. Harbacek was doing, I mean, engaged in assembling there, wear goggles when they did chipping? A. No, sir. There are lots of us wear glasses. I have not seen many of them wear goggles.

"Q.   You say you have not seen many?   Did you see any of them?   A.   No, there were not many of them.

"The Court: Not many?   A.   No, once in a while I would see a fellow have a pair of goggles.

"The Witness:   That is right.   That is the men next to the laborers that done the chipping.

"Q.   You were in the same department as they were in?   A.   Yes, sir."   Further, he said, "I don't know whether there were any goggles down at the tool house or not.   I never asked for goggles at that time.   I wore goggles sometimes."

From the foregoing it appears that those employees of defendant Fulton Iron Works who did steady chipping, work largely of the same character as that done by plaintiff, wore goggles; that "once in a while" employees in the same department as plaintiff would wear them; that although there was no evidence as to whom the goggles belonged, it is fair to assume that they were furnished by defendant as plaintiff had been told, when first employed, that defendant had everything "that pertained to the job," and, furthermore, if the goggles had not belonged to defendant, plaintiff would have most likely offered testimony to that effect; that no request was ever made by plaintiff for goggles; and that plaintiff did not know whether defendant had any goggles in the tool room or not.   Under his petition the burden was upon plaintiff to prove that defendants *failed to provide him with goggles,* which means nothing more than that goggles must have been procured by defendant beforehand and made ready for plaintiff's use.   This, in our opinion, the testimony failed to do.   The nearest approach thereto was that neither plaintiff or his witnesses knew whether defendant had any goggles in the tool room or not.   On the contrary, the evidence tended to show by plain inference if not directly, that defendant did furnish goggles to some of its employees.   Accordingly, we hold that the negligence charged was not proven.   It follows that plaintiff was not guilty of contributory negligence.

Counsel for plaintiff contends that defendant Fulton Iron Works Company's plea of contributory negligence admits negligence in said defendant. To this we cannot give assent and the point is ruled against plaintiff. [Peterson v. Railway Co., 211 Mo. l. c. 519, 520.]

III. With reference to the question of assumption of risk, a review of the evidence shows that under the uncontroverted facts in the case plaintiff had had five years' experience as a machinist before he was employed by defendant and understood when he was employed that he would be required to do some chipping; that he had been employed by defendant three or four months before the day he was injured, during all of which time he had been doing chipping of the character he was doing when injured; that some days he did more chipping than on others, but averaged about three hours a day; that the work of chipping was comparatively simple, consisting of smoothing off or removing rough places from castings by placing a cold chisel against the part desired to be chipped off and striking the head of the chisel with a hammer; that no one directed him as to where to place the chisel, he having complete control of the manner in which the chipping was done; that he knew that when he placed the cold chisel against a part of a casting and struck it with a hammer, chips or pieces of iron would fly in all directions; that he knew that if one of these pieces struck him in the eye it would hurt his eye; that he had previously been struck on different parts of the body by such chips and thought that some had struck him in the face; that the cold chisel and hammer used by him were in good condition, with no defects; that he saw other employees who did steady chipping wearing goggles and also saw a man working on an emery wheel on the same floor with him wearing goggles; that he procured his tools from the tool house but at no time asked for any goggles; and that he had never complained to any one that goggles were not furnished him, or that he needed the same.

*Assumption of Risks.*

An analysis of these facts, when measured by the principles hereinbefore enunciated, leads us to the conclusion that the flying of chips or particles of iron from castings was an usual and obvious risk incident to the business of defendant Fulton Iron Works Company as it was carried on, which plaintiff assumed when he entered and continued in the employ of said company. Without remonstrance, he voluntarily exposed himself to the hazards of the employment, in effect waived the danger and consented to assume it.   [Johnson v. Brick and Coal Co., 276 Mo. l. c. 53; Patrum v. Railroad, 259 Mo. 109; Morris v. Pryor, 272 Mo. 350; Chrismer v. Bell Tel. Co., 194 Mo. 189; Powers v. Loose-Wiles Company, 195 Mo. App. 430; Wexler v. Salisbury, 91 Minn. 308; Cripple Creek S. & O. Co. v. Souza, 37 Colo. 393; Illinois Central Ry. Co. v. Young, 124 Ky. 8.]

As was said by WOODSON, J., in Johnson v. Brick and Coal Co., 276 Mo. l. c. 53, in speaking of risks incident to employment and illustrating the same in a manner closely correspondent to the facts in the case at bar:

"Such risks are purely incidental to the employment, and is such an injury as is liable to occur at any time during the performance of the work undertaken, unaided in any degree by the negligence of the employer. For instance, should Jones employ Brown as a blacksmith, it would be the duty of the former to furnish the latter with reasonably safe tools or appliances with which to do that work, and it would be the duty of the latter, among other things, to weld iron, and in order to do that it would be necessary for him to heat the ends of the two pieces of iron to almost a white heat, and place them in contact with each other and hammer them together, and as a necessary incident thereto hot scales and sparks will fly therefrom, which would be liable to strike him in the eye and destroy the sight thereof; such a liability would be a risk incident to the work undertaken, in which the employer would have had no part, and which the employee assumed as an implied part of his contract of employment, and for such an injury he could not re-

cover damages from his employer for the reason he assumed the risk. But suppose upon the other hand the injury had occurred to his eye by reason of a sliver of steel flying from a defective and dangerous hammer negligently furnished by the employer while he was pounding the iron mentioned. Such injury would be the result of negligence of the employer."

In Wexler v. Salisbury, supra, defendants were the manufacturers of iron beds. It was the duty of plaintiff to chip bed rails, which required him to pound on the same with a hammer to remove ragged edges and pieces of iron which adhered thereto. While so doing a piece of iron flew from the portion of the bed rail which he was striking and injured one of his eyes. Plaintiff claimed that he had not been furnished goggles, in use for persons engaged in such work. It was shown, as in the case under review, that small pieces of iron would, and did continually, fly from the rails when the necessary hammering was done, striking plaintiff's face. From a directed verdict for defendants plaintiff appealed. It was held that the court properly directed a verdict for defendants as plaintiff assumed the risk. The court said, at page 310:

"It is urged that the danger to the eyes of the laborer that arose from the flying particles in the process of the work was so apparent that the risks were assumed by him. Whatever views may be suggested about the policy which underlies the doctrine of the assumption of risks by servants in hazardous occupations, it has been repeatedly held that where a servant enters another's employment, and is put to work at an occupation which is dangerous by reason of plain and apparent risks, which he appreciates, and continues therein, after knowledge of the hazards incurred without objection or promise by the employer to furnish protection he cannot recover damages for injuries arising therefrom."

In Cripple Creek S. & O. Co. v. Souza, supra, a servant was engaged in chipping certain rolls of an ore crusher, by using a hammer and chisel as

in the case at bar. He well knew that pieces of steel flew about the room as they were chipped off. After he had been so engaged an hour or so, upon the request of a co-employee, he surrendered the hammer with which he had been striking the chisel to said co-employee and took a position in the line and direction of the blows. While in this position he was injured by a piece of steel chipping striking him in the eye. Held, that, having continued to work with knowledge of the dangerous character of the employment, and without protest, he assumed the risk.

For the reasons appearing herein, we therefore hold that the trial court properly sustained the demurrers offered by defendants at the close of plaintiff's evidence and that the judgment should be affirmed. It is so ordered. All concur.