## LENA DIETZMAN v. ST. LOUIS SCREW COMPANY, Appellant.

### Division One, July 31, 1923.

1. **NEGLIGENCE: Safe Place: Ladder on Narrow Platform.** It is not enough that the ladder which the manufacturing company kept on a narrow platform for the use of workmen in repairing machinery in a chute above, was safe; it was also necessary that the platform on which the ladder was kept for that known purpose, and which slipped from the platform when the workman standing on it leaned over to repair the machinery, was also safe. And the evidence being that there was an open space affording ample opportunity to so extend the platform as to make it a safe place upon which to place the ladder which the workman was expected to use, and that previous troubles had resulted from the narrowness of the platform, the question whether it was a safe place for the particular work is one for the jury, where the substantial evidence on the point is conflicting.

2. ———: ———: **Assumption of Risks: Not Pleaded.** The servant assumes no risks which arise from the negligence of the master; he assumes only such risks as are incident to his employment, which means such injuries as are liable to occur at any time in the performance of the work undertaken unaided in any degree by the negligence of the master. It is the duty of the master to exercise ordinary care to supply his servants a reasonably safe place in which to work, and if he neglects that duty and by reason of his negligence the servant is injured, the servant does not assume the risk of injury. Besides, assumption of risks must be pleaded, or it has no place in the case.

3. ———: ———: ———: **Foreman.** The fact that the workman was a foreman or "straw boss" of the particular part of the work in which he was engaged at the time he was injured and that he had a helper to assist him, did not impose upon him the assumption of the risks, where he was actually doing the work, in the

place and with the appliances furnished by the master, and was injured because of the master's negligence in failing to make the place reasonably safe.

4. ——: ——: Instruction: Failure to Make Safe: Assumption of Injury as Sequence. An instruction which tells the jury that if defendant failed to exercise ordinary care to extend the narrow platform on which deceased was required to work and that such failure caused the workman's injuries, does not assume that the platform was not reasonably safe, and is unobjectionable.

5. ——: ——: ——: Assumption of Risks: Accident. Where the case is, by both the pleadings and proof, one of negligence or no negligence on the part of the master, and of contributory negligence or no contributory negligence on the part of the deceased workman, instructions upon assumption of risks or on the theory of accident should not be given.

6. ——: Instructions on Abandoned Allegations. Where plaintiff has abandoned certain alleged acts of negligence it is not error to refuse instructions asked by defendant withdrawing them from the jury's consideration.

Appeal from St. Louis City Circuit Court.—*Hon. Frank Landwehr*, Judge.

AFFIRMED.

*Kelley, Starke & Moser* and *Charles E. Morrow* for appellant.

(1) Defendant's demurrer to the evidence should have been given. The defendant was guilty of no negligence. Modlagl v. Iron Co., 248 Mo. 587; Armour v. Hahn, 111 U. S. 313; Huskey v. Boiler Co., 187 Mo. App. 438; Broomfield v. Const. Co., 118 Mo. App. 254; Kleine v. Shoe Co., 91 Mo. App. 102; Forbes v. Dunnavant, 198 Mo. 193; Cooney v. Gas Light Co., 186 Mo. App. 156; Miller v. Railroad, 175 Mo. App. 349; Bennett v. Lime Co., 146 Mo. App. 572; 3 Labatt on Master & Servant (2d Ed.) sec. 924. Plaintiff's deceased husband was defendant's foreman in charge of that department of the plant and undertook to make this temporary repair in

his own way and in the absence of the master, and assumed the risk and cannot recovery. Harbacek v. Fulton Iron Works Co., 229 S. W. 803; Johnson v. Brick & Coal Co., 276 Mo. 53; Patrum v. Railroad, 259 Mo. 121; Morris v. Pryor, 272 Mo. 350; Chrismer v. Bell Tel. Co., 194 Mo. 189; Powers v. Loose-Wiles Co., 195 Mo. App. 430. Plaintiff's instruction numbered one is erroneous. Authorities supra, and Longree v. Mfg. Co., 120 Mo. App. 478; Bowen v. Railroad, 95 Mo. 268. (3) The court erred in refusing defendant's Instruction 12 on the question of assumption of risk. It was at least a question for the jury as to whether or not deceased's injuries were the result of a risk and danger inherent in' the work he was performing, and that he fell from the ladder as the result of an accident without any negligence on the part of the defendant. Harbacek v. Fulton Iron Works Co., 229 S. W. 803; Johnson v. Brick & Coal Co., 276 Mo. 53; Patrum v. Railroad, 259 Mo. 121; Morris v. Pryor, 272 Mo. 350; Chrismer v. Bell Tel. Co., 194 Mo. 189; Powers v. Loose-Wiles, 195 Mo. App. 430; West v. Hollady, 196 S. W. 403; Thomas v. Railroad, 109 Mo. 187; Fogus v. Railroad, 50 Mo. App. 272. (4) The court erred in refusing defendant's Instruction 13, which told the jury that if the deceased was injured solely by reason of an accident, the plaintiff cannot recover. Doody v. Cal. Woolen Mills Co., 216 S. W. 535; Sawyer v. Railroad, 37 Mo. 240; Henry v. Ry. Co., 113 Mo. 525; Feary v. Met. Ry. Co., 162 Mo. 75; Felver v. Railroad, 216 Mo. 208. (5) The court erred in refusing defendants Instructions 5, 6 and 9 withdrawing assignments of negligence in the petition upon which the plaintiff was not entitled to recover. And especially defendant's instruction numbered 9, withdrawing the assignment of negligence that the defendant had failed to provide a screening, hand-rail or guard around the hopper or platform and upon which the court had permitted the plaintiff to introduce evidence. Russell v. Barcroft, 1 Mo.

663; Higgins v. Ry. Co., 197 Mo. 300, 314; Roseman v. U. Rys. Co., 197 Mo. App. 342; Allen v. Lbr. Co., 171 Mo. App. 503.

*Eagleton & Habenicht* for respondent.

(1) The demurrers to the evidence were properly overruled. (a) The appellant cannot adopt a new theory on appeal. Lowenstein v. Railroad, 134 Mo. App. 24; Fulwider v. Trenton Gas Co., 216 Mo. 582, 594; Berger v. Storage, Co., 136 Mo. App. 36. (b) It was not necessary that the defendant should be able to anticipate the happening of the very occurrence which resulted in the injury. Washburn v. Laclede Gas Light Co., 202 Mo. App. 115; Dean v. Railway Co., 199 Mo. 411; Buckner v. Horse & Mule Co., 221 Mo. 710; Harrison v. Light Co., 195 Mo. 629; Hoepper v. Southern Hotel Co., 142 Mo. 378; Daneschocky v. Sieble, 195 Mo. App. 470; Wright v. Terminal Ry., 195 Mo. App. 480. (c) The rules pertaining to places of work which are continually changing, and where transitory perils are encountered, are not applicable to the facts involved in the case at bar. (d) There was evidence of negligence on the part of the master, and Dietzman did not assume the risk. Kuhn v. Lusk, 281 Mo. 338; Deming v. Alpine Ice Co., 214 S. W. 273; Fish v. Railroad, 263 Mo. 126; Williams v. Pryor, 272 Mo. 621; Curtis v. McNair, 173 Mo. 270; Jewel v. Bolt & Nut Co., 231 Mo. 176; Williamson v. Union Elec. Co., 281 Mo. 544. (2) No error was committed in admitting evidence "that a rail, guard or screening could have been placed around the platform in question." Probst v. Basket & Box Co., 200 Mo. App. 582. (3) No error was committed in giving plaintiff's instruction numbered 1. The instruction was proper and submitted the necessary essentials to a recovery. Distinguishing the cases of Longree v. Mfg. Co., 120 Mo. App. 478; Bowen v. Railroad, 95 Mo. 268.

GRAVES, P. J.—Action for the death of William Dietzman, which death is alleged to have been occasioned by the negligence of the defendant. The plaintiff is the widow of deceased, William Dietzman. Dietzman was an employee of defendant and fell from a ladder and was killed in the act of repairing machinery in the room wherein he worked at nights, and in which room he was headman or foreman during the shift of his work. With deceased was one Lomax, who assisted him in the work. The place of work was what was known as the coal room of defendant's plant. Defendant is engaged in the manufacture of screws, bolts, nuts, washers, bar iron and other iron products in the roller mills conducted by it in St. Louis, Missouri. The exact situation is one difficult of description, but an attempt is made to give an accurate description by learned counsel for defendant. Counsel for respondent in their short statement say: "We consider 'Appellant's Statement of Facts' a fair and reasonable statement of the material facts in controversy with the exception that we do not desire to be understood as consenting to statements of law and argument which are co-mingled with the statement of facts." With this concession of counsel we shall feel free to borrow from appellant's statement such portions as we deem outline the facts, and especially such portions as explain the *locus in quo* at the time Dietzman fell and was fatally injured.

Upon a trial before a jury, the plaintiff had a verdict for $10,000, the amount for which she sued, and from the judgment upon that verdict defendant has appealed. The petition thus charges the alleged negligence of the defendant:

"Plaintiff further states that on or about the 7th day of August, 1919, the deceased was in the employ of the defendant as a laborer, earning $40 per week; that while he was in the employ of said defendant, at its aforesaid roller mill, and while working within the line and scope of his employment, he was caused to fall or be

thrown from a ladder which was resting on a hopper, or platform, thereby dropping a distance of about forty-five feet, to a concrete floor located below said hopper or platform, and to sustain serious injuries, which resulted in the death of said William Dietzman on the day following, to-wit, August 7, 1919. Plaintiff further states that the said injuries and death of said William Dietzman, plaintiff's deceased husband, were caused by the negligence and carelessness of the defendant in this, to-wit:

"That defendant negligently and carelessly failed to exercise ordinary care in furnishing plaintiff's said husband with a reasonably safe place in which to work, in that he was ordered, directed and caused to work on a ladder which was located close to the edge of said hopper, or platform, and at a place where it became necessary for him to lean over, and away from said platform, or hopper, thereby entailing great danger to plaintiff's said husband. That defendant negligently and carelessly failed to use ordinary care to provide any platform between the hoppers, or to extend said hopper, or platform, in such a manner that it would have been possible under the circumstances for the plaintiff's said husband to place the ladder, on which he was required to work, immediately under the work which he was required to do, and in such event would have made it possible for the plaintiff's said husband to have done the work without leaning over and endangering his life and limbs as aforesaid.

"Plaintiff further states that the defendant knew, or by the exercise of ordinary care could have known, that the work which the plaintiff's said husband was required to do, and which he was doing at the time of the accident, necessarily required him to lean over, and away from said ladder, and that on account of said fact there was great danger of him falling, or being thrown off said ladder, and nevertheless defendant failed and omitted to furnish or provide any screening, hand-rail or guard

around the hopper, or platform, so that plaintiff's said husband could have done the work in safety, and when the defendant knew, or by the exercise of ordinary care could have known, that it was practicable to place a screening, hand-rail or guard around the place where he was required to work, and prevented plaintiff's said husband from falling to the concrete floor as aforesaid. That defendant negligently and carelessly maintained and pro- vided a bolt in the iron arm of a butterfly valve axle, when said bolt was so defective that it would not hold the said iron arm in proper place or position, and would permit said iron arm to move out, and away from said butterfly valve axle, when in the exercise of ordinary care defend- ant could have so adjusted said iron arm that it would not move out, and away from said axle, and would have been held stationary onto said axle. That defendant neg- ligently and carelessly tied said iron arm overhead by means of a rope which permitted said iron arm to swing, or move while in the course of adjustment, thereby en- tailing great danger to the plaintiff's said husband while upon said ladder attempting to adjust said iron arm. That defendant was negligent and careless in ordering plaintiff's said husband to do the character of work above described, when it knew or by the exercise of ordinary care would have known that the work under the circum- stances, due to the defects and lack of guards and safety appliances as aforesaid, was highly dangerous.

"Plaintiff further states that while her said husband was upon said ladder attempting to adjust said iron arm to said butterfly valve axle, said iron arm swung out, and her said husband was thus and thereby pulled, jerked, thrown and caused to fall from the ladder to the concrete floor as aforesaid.. That he was so pulled, thrown, jerked, caused to fall and was killed, by reason of and on ac- count of the aforesaid acts of negligence and careless- ness on the part of the defendant."

The answer was (1) a general denial and (2) a plea of contributory negligence, which specifically set

out the alleged negligent acts of the deceased, which was alleged to have contributed to his injury and death. Reply was a general denial.

From the statement of appellant's counsel we borrow these details of facts:

"William Dietzman, plaintiff's husband, on the 7th day of August, 1919, was in the employ of the defendant as a night foreman at its plant. He was in charge of the operation of the plant in which he worked and it was his duty, as the foreman of the defendant, to make and cause to be made any repairs which might become necessary while he was on duty. In the conduct of its business the defendant maintained a coal pulverizer. The coal was pulverized by machinery and placed in hoppers or bins by means of an elevator which raised it to a certain height and poured it into chutes leading to the hoppers or bins. There were two hoppers or bins, known as number one and number two, which were located below a platform twenty-two feet above the concrete floor of the building. A little over twelve feet above this platform there was extended from the elevator a chute which carried the coal for a short distance and then branched into two chutes leading to the hopper below. There was a device known as a butterfly valve placed in this chute and was so constructed that when it was turned in one position it closed one of the chutes and left the other open, and caused the pulverized coal to pass through the other chute, and when shifted in another position would cause the pulverized coal to pass through the chute from which it had been removed. This valve was placed on a metal axle about one inch in diameter and the end of this axle extended beyond the side of the chute for a distance of about six inches, and on the end of this axle there was placed an arm, called the butterfly valve arm, which consisted of a piece of metal about three to five feet long, one inch and a half wide and a quarter of an inch thick and weighed about fifteen pounds. The axle of the butterfly valve was placed through an opening in the middle

of this arm, and the arm extended about two and a half feet on either side of this axle. The arm was fastened to the axle by means of an iron pin which ran through the arm and also the axle. Ropes were attached to either end of the arm extending down to the floor, and when one of these ropes was pulled downward it would cause one end of the arm to come down and the other to go up and shifted the valve inside of the chute. Above these hoppers or bins, and on the east side of the chutes, there was a platform about three feet wide and about ten feet long, the north edge of which extended, according to the testimony of defendant, which was given by measurements from one and three-quarters of two and one-half inches north of the axle of the butterfly valve; according to plaintiff's testimony, the north end of the platform was about two feet south of the axle of the butterfly valve, so that it was contended that when a ladder was placed near the north edge of this platform it would be necessary for a person standing upon this ladder to reach and lean over in order to reach the axle of the butterfly valve. About ten feet above the first platform there was another platform or iron grating, the dimensions of which are not in evidence, but which extended even beyond the elevator, which ran perpendicular on the north of the chutes and which was located about two and a half feet above the axle of the butterfly valve and was so located that the arm of the butterfly valve could not be turned clear around, but when one end was pulled down the other end would finally strike this platform above. On the east side of these hoppers and extended from the ground up to and along the east side of both of these platforms there was a perpendicular stationary iron ladder, the north edge of which was about three feet south of the north edge of the first platform. A complete model of the elevator, ladders, chutes, platforms, butterfly axle, butterfly valve arm and so forth, was offered in evidence in this case and shown to be correct and identified as defendant's exhibit number one, which will be

presented to this court on the argument of this case and will give the court a better understanding of the exact situation than the court can get from a description or from the evidence in this record. This model does not show the hoppers or bins which were immediately under the first platform and to which the chutes lead, because it was thought unnecessary, as only the chutes and platforms were material. The defendant had another ordinary ladder about eight or nine feet in length, which, on the night that the deceased was injured, was found by deceased and his helper lying on the first platform. On the night the deceased was injured, he and his helper by the name of Lomax, were on duty and the deceased, as stated before, was the defendant's night foreman and in charge of that particular department of defendant's plant and at that time represented the defendant and had no one in superior authority over him present in that department of the plant that night. It was the duty of the deceased to see that this department kept operating and to make repairs if anything got out of repair during the night.

"On the night of August 7, 1919, while the deceased Dietzman and his helper Lomax were alone in this department of the defendant's plant, the arm of the butterfly valve had come off of the axle and was hanging by a rope which was attached to it and also to the grating of the platform above, and the deceased Dietzman undertook to fix it. He called his helper Lomax and they both went up the perpendicular stationary iron ladder to the first platform and there found a ladder about eight or nine feet long lying on this platform and placed this ladder with its lower end on the first platform away from the east side thereof a distance of just room enough for Lomax to stand between the lower end of the ladder and the east side of the platform, the north leg of the ladder being about six or eight inches south of the north end of the platform, and its upper end against the coal chute above. Dietzman told Lomax, his helper, to hold the

ladder at its base and deceased ascended the ladder while Lomax held it. The deceased went up the ladder far enough to take hold of the arm of the butterfly valve and was attempting to replace it on its axle. Lomax testifies that he believes the deceased's feet on a rung of the ladder were about six feet above the platform on which the ladder rested and that deceased took hold of the arm of the butterfly valve and was attempting to replace it and that the arm swung away from the shaft, unbalanced him and jerked him off of the ladder and deceased fell to the floor below and was injured. The plaintiff's evidence tended to show that he was picked up unconscious and taken to the city hospital and soon thereafter died, and that his death was the result of injuries received in falling from the ladder. There was a sharp conflict in the testimony as to whether or not the first platform upon which the ladder was placed was far enough north for the ladder to be placed thereon and directly under the axle of the butterfly valve. The plaintiff's evidence, which consisted of mere estimates of the witnesses, tended to show that the ladder was from eighteen inches to two feet south of the axle of the butterfly valve, and the defendant's evidence tended to show that by actual measurement and by a line, to which was attached a weight being held at the end of the axle of the butterfly shaft and dropped to the platform below, the north edge of the platform was from one and three-quarters to two and a half inches north of the axle of the butterfly shaft. However, all the evidence for both plaintiff and defendant showed that the deceased was the foreman in charge at the time; that it was his duty, as a servant of the defendant, to repair any defects which might occur while he was on duty; that as a matter of fact the arm of the butterfly valve came off that night while he was on duty and that he undertook to repair it by placing it back on its axle in his own way. He placed the ladder where he wished to place it, directed his helper to hold it and ascended the ladder to put the arm

of the butterfly valve back on its axle and directed his helper to hold the ladder while he ascended it and repaired said appliance, and while he was on the ladder and attempting to replace the arm on its axle he fell from the ladder and was injured. The evidence of the plaintiff tended to show that he lost his balance and was jerked off of the ladder because of the fact that the arm of the butterfly valve swung away from him and caused him to lose his balance and jerked him off of the ladder, but from this evidence the jury would have a right to infer that he lost his balance and fell from the ladder, or that the cause of his fall was unknown. The plaintiff's evidence tended to show that by placing the ladder where he placed it some six or eight inches south of the north end of the platform he would have to lean over and reach to the north in order to put the arm of the butterfly valve back on its axle; but the evidence of the defendant tended to show that if he had so desired, he could have placed the ladder on the platform below and directly under the axle of the butterfly valve. If the estimate of the plaintiff's witnesses, without measurement as admitted by them, was taken to be absolutely true, the ladder was placed from six to eight inches south of the north end of the platform and the axle of the butterfly valve was from eighteen to twenty-four inches north of the north end of the platform. So that, taking the plaintiff's evidence in its most favorable aspect, the axle of the butterfly valve could not have been more than thirty-two inches north of the north side of the ladder as it was actually placed. The plaintiff's testimony conclusively and uncontradictably showed that the ladder never moved; that Lomax held it firmly and that deceased's injury was not in any way caused by the ladder moving or any insufficiency or defect in the ladder. All the evidence further shows, without contradiction, that whatever position the deceased assumed on the ladder, that the ladder itself was held firmly and never moved.''

· It should be said that there is much of argument in this statement, and further that it was shown that the short ladder from which deceased fell was kept, just where it was found that night, for the purpose of making repairs to the chutes, this butterfly valve, or other parts operated at that point. In addition the evidence shows that the general foreman of defendant's plant was one Edward Bilger; that Bilger hired and directed the men in this coal room, including Dietzman. He, Bilger, said: "Well, my position was to make out the reports of the plant and be general overseer of the coal plant, and Dietzman's position was to operate the mills and act as a straw boss under my supervision."

From the foregoing answer of Bilger, upon motion of defendant's counsel the court struck out the "straw boss" portion of the answer, although the whole testimony of Bilger indicated that such was his real character; that deceased was in charge of the plant for pulverizing the coal at nights, and worked himself along with the helper. There is evidence that some two or three weeks prior to the accident the deceased complained to Bilger about the platform from which he had to make repairs, and Bilger promised to take the matter up with the master mechanic. Dietzman's complaint was that he had to lean over, and that it was dangerous without an extension of the platform to the north. This suffices to outline the case. Specific reference to facts can be made under the points discussed in the opinion.

I.   (a)   The plaintiff's case was submitted to the jury upon the ground of defendant's alleged neglect in failing to extend the platform to the north, so that deceased could have so placed his ladder as to work under the butterfly valve axle in order to reach the point of the trouble with the machinery to be repaired.

**Safe Place.**   This as preliminary to the point raised as to the failure to give defendant's instruction in the nature of a demurrer to the evidence. If the petition stated a cause of action upon this matter, then it is shown that

there was a divergence in the proof. Plaintiffs proof tended to show that the axle upon which the arm of the butterfly valve was attached was some distance north of the north side of the platform, so that deceased had to lean toward the north to replace this displaced arm of the butterfly valve. Under the evidence, the short ladder was kept upon this platform for the purpose of repair work which was to be done from the platform. This platform was used (among other uses) as a place from which to repair the chutes, butterfly valve, and other things between it and the upper platform ten or twelve feet above it. For this purpose it was a place of work, and it was defendant's duty to have exercised ordinary care to have such place reasonably safe for the performance of such work as was to be done therefrom. It is urged here (seemingly for the first time) that the repairing which deceased was doing upon this fateful night was an isolated instance, but this is not in full accord with the record. Repairs at and around this point had been previously made, and that troubles were expected there is shown by the fact that defendant kept the short ladder on this platform for the purpose of repairing. It is true as urged that the ladder proved safe, but this does not cover the point. Not only should the ladder have been a safe appliance, but the platform should have been broad enough toward the north, so that the ladder could have been so placed as to have obviated the dangerous necessity of leaning to one side in order to reach the point of trouble. Defendant recognized this platform as a place from which repairs were to be made by keeping thereon the short ladder for use in making the repairs. It thereby became a place of work for deceased, because it stands admitted that it was his duty to make the repairs. It was the duty of defendant to use ordinary care to have this working place reasonably safe for the performance of the work there to be done. There was an open space between the platform and the elevator, from which the two chutes ran, and this space

300 Mo.—14

afforded ample opportunity to extend the platform as to have made it safe for the work which was to have been done therefrom. Defendant's contention below was that the platform did extend sufficiently toward the north to make it safe, but plaintiff's evidence was to the contrary, and the jury seems to have given credence to the latter evidence, rather than that of defendant. Nor is there question as to the fact that defendant knew of the situation in ample time to have remedied it before the accident. In fact it constructed the place, and when it made it a working place, was bound to know its condition. So that upon this particular charge of neglect there was evidence sufficient to make it a jury question. We are cited to cases like Forbes v. Dunnavant, 198 Mo. 193, and Modlagl v. Iron & Foundry Co., 248 Mo. 587, by appellant. These cases have no application to the facts of this case. In the former the plaintiff was engaged in the erection of a scaffold—a working place for others—and was building it from a pile of lumber furnished by the defendant. From this pile the workmen selected what they thought suitable. A fellow-servant selected a defective board, which was put in the scaffold, and this board broke, and thereby plaintiff was injured. We ruled that the negligence was that of a fellow-servant, and plaintiff could not recover. The question of a safe place to work was not the determining question in that case. The Modlagl Case is as far from applicability.

(b)   Next it is insisted that deceased "was defendant's foreman in charge of that department

**Assumption of Risks.**   of the plant and undertook to make the temporary repair in his own way and in the absence of the master, and assumed the risk and cannot recover."

Among others, the cases cited are Harbacek v. Fulton Iron Works Co., 229 S. W. 803, and Johnson v. Brick & Coal Co., 276 Mo. l. c. 53. Such cases do not help defendant here. Assumption of risks is discussed, but not upon facts as here. These cases announce just what

we shall announce as the rule of law here. The servant cannot recover for an injury which arises from risks which are incident to his employment. These risks he assumes when he contracts to do the work. On the other hand the servant assumes no risks which arise from the negligence of the master. In the Johnson Case, supra, in discussing the matter as to what is a risk incident to the employment, we used this language: "Such risks are purely incidental to the employment, and is such an injury as is liable to occur at any time during the performance of the work undertaken, *unaided in any degree by the negligence of the employer.*" The italics are ours.

In contending for assumption of risk in this case learned counsel overlook the gist of plaintiff's action. Plaintiff's petition, among other things, relies upon the neglect of the master to furnish a safe place to work, and specifying in particular this platform, and its narrowness toward the north, at the point where repairs were to be made. This platform was the place at which the repair work between the two platforms was to be done, and the exercise of ordinary care to have it reasonably safe was the legal duty of the master, and a failure to perform this was negligence. The risk occasioned by such failure was not assumed by plaintiff. True it is that plaintiff was to do repair work, along with other work in this coal room, and that he had a helper, who worked with him, and in this sense he might have been a foreman directing the work at the night shift, but this does not change the situation. If a foreman, he was acting in a dual capacity when doing the repair work. He was there actually doing the repair work, with the assistance of the other man, and doing it in a place and with the appliance furnished by the master. If the master failed to use ordinary care to have the place reasonably safe for the work required of plaintiff, then we have liability. The demurrer to the evidence was well ruled by the trial court. However, it should be said that assumption of risk is not pleaded.

II.   Much  complaint  is  made  as  to  plaintiff's  in-
struction numbered 1.  This instruction covers plaintiff's
theory of the case, and bottoms plaintiff's right to re-
cover upon the idea that the defendant neglected to ex-

Sequences from
Hypotheses.

tend  its  platform  to  the  north  so  as  to
make  such  platform  a  safe  place  for  the
performance of the repair work which might
have to be done from time to time.  The concluding por-
tion of the instruction reads:

"And if the jury further find and believe from the
evidence that the defendant failed to exercise ordinary
care  in  not  extending  said  platform  to  the  north  and
that  such  failure,  if  any,  directly  caused  whatever  in-
juries,  if  any,  were  sustained  by  the  said  William  Dietz-
man  at  the  time  aforesaid,  and  that  by  reason  thereof
the  said  William  Dietzman  was  injured  as  aforesaid,
from  which  injuries  the  said  William  Dietzman  died  on
or  about  the  7th  day  of  August,  1919,  and  that  the  said
William Dietzman at and prior to the time of his injury
was  not  then  and  there  guilty  of  any  negligence  which
directly contributed to the cause of said injury, and that
he  was  exercising  ordinary  care  for  his  own  safety  then
your  verdict  will  be  for  the  plaintiff."

The instruction is quite long, and especially requires
the finding of a number of things, all of which when taken
together, are summarized in the paragraph quoted.  We
can best dispose of the matter by nothing the objections
urged to the instruction.  They are:

"Plaintiff's instruction numbered one is erroneous:

"(a)   It makes the defendant liable for not extend-
ing  and  having  a  permanent  platform  upon  which  the
deceased  might  have  placed  a  ladder  directly  under  the
temporary  and  isolated  repair  which  arose  without  the
knowledge of the master, a duty which was not imposed
upon the defendant by law.

"(b)   It requires the defendant to have prepared in
advance a particular appliance and place for doing the
temporary  and  isolated  repair  which  arose  without  the

knowledge of the defendant, a duty not imposed upon the defendant by law.

"(c)   Said instruction is erroneous because it told the jury that defendant was liable if the deceased was required to assume a, position of danger, without defining the degree of danger; required to make the defendant liable and without requiring the jury to find that the place or appliance was in fact not reasonably safe.

"(d)   Said instruction is erroneous because it fails to require the jury to find that if the platform had been extended the deceased would not have been injured, but makes defendant liable if it could have extended the platform before the deceased was injured and failed to so do.   Said instruction also assumes that the deceased would not have been injured if he could have worked immediately underneath the axle of the butterfly valve so that he would not have been required to lean over."

We have spoken of one matter suggested by objections "(a)." and "(b)" supra.   We have said that defendant made this platform a working place for the making of repairs between the two platforms, and further said that the evidence not only fails to show this repair to have been an isolated repair, but that defendant had prepared to make repairs, from this platform, by having and keeping thereon a short ladder to be used in the work.   Defendant anticipated that the arm of this butterfly valve might fly off, and had tied it by a cord, so that it could not fall upon the men below.   It had in fact been off before this, and repairs upon the chutes had been made before this incident.   Not only so, but no suggestion is made of this being a single isolated repair in the whole course of the trial.   These objections are not substantial.

Nor is there substance in objection "(c)" supra. In specific words no portion of this instruction says to the jury to find whether the platform was or was not reasonably safe, but it does require the jury to find that the narrowness of the platform required the deceased

to occupy an unsafe position, and further to find that this occasioned the injury. In addition the jury were required to find that defendant could have remedied the matter by extending the platform, and that defendant had knowledge of the situation of danger, and by exercise of ordinary care could have had such knowledge. In other words, what the instruction required the jury to find, was equivalent to a finding that the platform was not reasonably safe. The last complaint, supra, is likewise without merit.

III.  Next it is urged that the court erred in refusing an instruction upon the assumption of risk. There is no assumption of risk in this case under the Missouri rule of assumption of risk. A risk growing out of the neglect of the master is not assumed by the servant. This is a case of negligence or no negligence upon the part of the master, and of contributory negligence or no contributory negligence upon the part of the servant. There was no place for an instruction upon assumption of risk. A further complete answer is that there was no plea of assumption of risk.

*Assumption of Risks.*

IV.  The court refused defendant's instruction upon the theory of an accident. The issues were negligence or no negligence. The evidence was along these lines. There was no evidence upon which to base an instruction upon the theory of accident. [Wise v. St. Louis Transit Co., 198 Mo. l. c. 559-560.]

*Accident.*

Defendant asked and got an instruction upon contributory negligence. Contributory negligence was the sole special defense. It is, in a way, inconsistent with accident. The issues made do not contemplate the defenses of accident. GANTT, J., in the Wise Case, supra, said:

"There was no evidence in the case of any accident or misadventure. The issue tendered by the pleadings and by the evidence was simply whether defendant was negligent or not, and the court was right in not inviting

the jury into a field of conjecture and speculation. Instructions are always to be confined to the issue and the evidence in the case.  There was no error in refusing it.''

The matter under consideration was the refusal of an instruction on accident.  The same is true in the case at bar.  It is a case of negligence or no negligence as to defendant, and of contributory negligence or no contributory negligence as to plaintiff.  If defendant's neglect occasioned the injury, then there was no accident.

V.  In the above we have covered all the points made and briefed by appellant in the brief, except points five and six, and these we take together.

Point five alleges error upon the part of the court in refusing to give Instructions 5, 6 and 9.  These instructions were instructions withdrawing from the jury certain assignments of negligence made in the petition, and especially that assignment relating to screening and hand-railing.  It suffices to say that plaintiff abandoned all these assignments of negligence when she came to submit her case to the jury.  As said the case was submitted upon a single issue which we have discussed.  The refusal of these instructions could work no harm in this situation.

By point six it is urged that the court erred in admitting evidence showing that the platform could have been screened or guarded by hand-rails or otherwise.  No cases are cited.  The plaintiff abandoned this charge of negligence in her petition, and as we have said above, the defendant was not harmed in the matter now urged.  The foregoing covers all the points made in the brief.  If this platform was a working place (and this is the only close question in the case) as we have ruled, then the case was fairly tried, and a proper verdict was returned. The judgment is affirmed.  All concur.