SAM CROSSNO v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Appellant.—41 S. W. (2d) 796.

Division One, September 5, 1931.

*J. L. Howell* and *Roy W. Rucker* for appellant.

828

*Louis E. Miller* and *Allen, Moser & Marsalek* for respondent.

FERGUSON, C.—Plaintiff brought this action against the defendant, Terminal Railroad Association of St. Louis, a corporation, for damages for personal injuries suffered when he was struck by a cut of freight cars which were being moved by the defendant company through what is known as the "Q" yards in East St. Louis, Illinois. The plaintiff had a verdict for $12,000, and from the judgment entered thereon, its motion for a new trial having been overruled, the defendant appealed.

Plaintiff's petition made conventional and formal allegations, recited plaintiff's injuries and charged seven specific and separate acts of negligence on the part of defendant, as follows:

1. Failure of the defendant to give any warning by bell or whistle of the approach of a train;

2. Failure of defendant to give notice by bell, whistle or otherwise that cars were to be diverted and the course of the cars changed from a southerly to an easterly direction;

3. Failure of defendant to keep a lookout or watch for pedestrians;

4. Failure of defendant to maintain a trainman in a conspicuous position on the leading car of the train of box cars;

5. Failure of defendant to maintain a light upon the first car;

6. That defendant knew or should have known of the custom to maintain a trainman on the front car in a conspicuous position, and that the defendant knew or should have known of the custom to keep a light on the front car;

7. For violation of the humanitarian rule.

Defendant's answer was a general denial, coupled with a plea of contributory negligence.

830

Plaintiff was injured on the 5th day of February, 1927, at about eleven o'clock P. M: He was an unmarried man, forty-two years of age, and regularly employed by the defendant company as a switchman. This action, however, is not bottomed upon the relation of master and servant. We undertake to describe the situation existing at the point where plaintiff claims to have been injured and the immediate vicinity thereof as shown by the exhibits introduced in evidence and the other evidence in the case. Front Street, or Levee Street, is a public thoroughfare of the city of East St. Louis, Illinois, running in a general north-and-south direction. This street is occupied by a number of railroad tracks and is also used by ordinary traffic. Along the east side of Front Street, in the district north of the Eads bridge, is the freight yard and depot of the Chicago, Burlington & Quincy Railroad Company referred to in the record as the "Q." In the "Q" yard the tracks run generally east and west. Plaintiff was injured at a point in the "Q" yard about 250 or 300 feet east of Front Street. The track on which plaintiff was injured is referred to as the "Q connection." This "Q connection track" extends north and south on Front Street until it reaches a point between 300 to 400 feet north of the "Q" depot, where it makes a broad curve to the east and enters the "Q" yard from the west, and runs east and west through the yard. To the north of the track and inside the curve there is a rocky knoll which to some extent obscures the approach of a train around the curve. The first track in the "Q" yard to the south was 40 to 60 feet distant. This "Q connection track" was used for transferring cars into the "Q" yard from the north. A well defined and much used footpath runs north of and parallel to this track. There were a number of active switch yards and railroad tracks in the vicinity with switching operations constantly in progress, both day and night, and trains and cars in movement, causing what plaintiff terms an almost continuous "railroad noise." The uncontradicted testimony was that men employed in defendant's switch yard known as Wiggins No. 2, where plaintiff worked, and also other employees of the defendant and of other railroads in that vicinity, went through the C. B. & Q. Railroad yard, referred to in the record as the "Q" yard, and upon and across the tracks there in going to and from their places of work. At the date of his injuries plaintiff was employed by the defendant company as a switchman in its Wiggins No. 2 yard, working on a night shift which went on duty at eleven o'clock P. M. He was required to report for work at the yard office. This switch yard was located at or near the north end of Levee or Front Street. Plaintiff's testimony is, that on the night of February 5, 1927, he left his home in East St. Louis, to report for work, and that he walked west along the path on the north side of the "Q connection

track," the usual route pursued by workmen in going to and from the Wiggins yard. When he was about 65 or 75 feet east of the point where the track commences to curve to the north he crossed over the track to the south side to answer a call of nature. He went about 15 feet south of the "Q connection" track, between that track and a line of freight cars standing on the first track to the south. When he had finished there, he walked north toward the "Q connection track" with the intention of recrossing that track and resuming his westward course along the path north of the track. He was walking at an ordinary gait, and as he neared the track looked first to the east and then to the west, being three or four steps away from the track when he looked to the west. He did not see or hear an approaching train and continued upon the track. When about the middle of the track he looked again to the west and discovered that a car moving from the west "was on me and I tried to make a jump and it hit me." Plaintiff was knocked down, "rolled under the cars" which passed over him and the fingers of one hand were severed, resulting in the loss of that hand, amputation becoming necessary. As the plaintiff fell under the moving cars he screamed, the train was stopped and he was removed from under the cars by a crew of trainmen of Alton and Eastern Railroad Company, who were at the time walking through the "Q" yard and alongside the connection track on the way to a restaurant for lunch. These men being nearby and hearing plaintiff's cries went to his assistance. One of them carried a lighted lantern by which he gave a stop signal and when the train was stopped these men with the aid of the lighted lantern located plaintiff and removed him from under the cars. The car which struck plaintiff was the leading car of a train or "cut" of about 35 cars which was being shoved or pushed eastward on the "Q connection" track. The engine which was pushing the cars was at the west end of the cut of cars and at the time plaintiff was struck was on Levee or Front Street. The first or leading car and the second car in the train as it moved east were low cars, "coal cars" and often referred to as "gondola cars." The third car was a "high car" or "box car." Plaintiff introduced into evidence defendant's rule number 103 which provided "when cars are pushed by an engine, except when shifting or making up trains in the yard, a trainman must take a conspicuous position on the front of the leading car." The evidence was, that defendant was not at the time engaged in "shifting or making up a train" within the meaning of the rule. It is conceded that no trainman was stationed or was riding on the leading car, nor did that car bear any light. Defendant's testimony was that the rear trainman with a lighted lantern was on the box car, the third car from the end of the cut of cars, and that the correct interpretation of the rule is that where

there are "low cars" preceding a high car the rear trainman should take a position on the first high car. Plaintiff offered testimony that the custom or practice of defendant's trainmen was to follow the literal wording of the rule, and if the first car was a gondola car or several gondola cars preceded a high car, the rear trainman was placed on the forward end of the first gondola car and the "third man" of the train crew should take a position on the first high car. The switch yards were not lighted and the witnesses stated it was a "dark night," "pretty dark" and "quite dark." There was a light at the C. B. & Q. depot, some 300 or 400 feet south of the point where plaintiff was struck, and another light about 150 feet to the northeast at the C. & A. depot. However, neither of these lights illuminated the tracks or yard to any extent, and a line of freight cars standing on the first track to the south shut off the light from the C. B. & Q. depot. S. S. Courtner, a switchman employed by the defendant company and a witness for defendant, testified that when "a string of cars is being pushed or switched by defendant company in the railroad yards in the night time" it was both the rule and practice for a white light to be displayed on the first or leading car. The only testimony with reference to the speed of the train is that "it was moving very slow." Defendant's evidence tended to show that the accident occurred in a manner entirely different from that related by plaintiff and at a different point from that at which plaintiff stated he was injured. Since we do not resolve the conflicting testimony, nor pass upon the weight and value of the testimony or the credibility of the witnesses, all of which is the peculiar province of the jury, we have accepted and stated the facts and inferences therefrom which are most favorable to plaintiff's theory.

At the close of all the evidence in the case, the defendant requested and the court refused an instruction in the nature of a demurrer to the evidence. Under the facts existing in this case as shown by the uncontradicted testimony, the defendant had no right to expect a clear track at the point where plaintiff claims to have been injured, or in the switch yard in which it was at the time carrying on its switching operations, as it was bound to know that its own employees and the employees of other railroads maintaining switching facilities and tracks in that vicinity were likely to be upon or near the tracks in the "Q" yard in carrying on their work and in going to and from their places of work. It was therefore "incumbent upon the defendant to use every reasonable precaution" in approaching and moving trains upon the frequently used portion of the track "to avoid injury to anyone who might be thereon." [Beard v. Mo. Pac. Ry. Co., 272 Mo. 142, 197 S. W. 907; Kippenbrock v. Wabash Railroad Co., 270 Mo. 479, 194 S. W. 50.] But the evidence is that

defendant backed a long train of freight cars upon a curved track through the unlighted switch yard on a dark night without a trainman or a light on the rear car and in violation, according to plaintiff's testimony, of its own rule, custom and practice. The evidence warranted the submission of the third, fourth and fifth grounds of negligence to the jury. It is further urged that the evidence shows plaintiff to have been guilty of contributory negligence as a matter of law and for that reason defendant's peremptory instruction should have been given. With this contention in mind we set out in detail the facts supporting plaintiff's theory which tend to show that the night was dark and the switch yard was not lighted; that there was no light on the rear of the cut of cars; that the point where the plaintiff was struck was 65 or 75 feet east of where the track commences to curve to the north and that a rocky knoll, north of and adjacent to the curve, to some extent obstructed the view around the curve; that there was a continuous din and noise caused by the movement and operation of trains in that immediate vicinity and that plaintiff testified that he looked in both directions before entering upon the track and did not discover the approach of the train. Under the facts and the rule that where "the evidence in regard to negligence is conflicting or even if it is all one way, yet if it is of such a character that reasonable minds might differ in respect thereto" the question of negligence is one for the jury (Hamman v. Coal Co., 156 Mo. 232, 56 S. W. 1091), the trial court did not err in refusing defendant's peremptory instruction or in submitting the issue of contributory negligence to the jury.

The only instruction offered by plaintiff was one on the measure of damages which was given. Plaintiff chose to go to the jury on that single instruction. Defendant offered a separate withdrawal instruction as to each of the first five grounds of negligence set out in the petition, all of which were refused. As we have pointed out in discussing the demurrer to the evidence there was substantial evidence in support of the third, fourth and fifth grounds of negligence alleged and to warrant their submission to the jury, and therefore the court properly refused the withdrawal instructions directed to these three charges of negligence. The withdrawal instructions marked "C" and "D" relating to the first and second grounds of negligence are as follows:

"C. The court instructs the jury that plaintiff is not entitled to recover under or upon that assignment of negligence wherein it is charged that the defendant negligently failed and omitted to give any warning by bell, whistle or otherwise of the approach of said cars and locomotive, and that assignment of negligence is withdrawn from your consideration.

"D. The court instructs the jury that plaintiff is not entitled to recover under or upon the assignment of negligence wherein it is charged that the defendant negligently failed and omitted to give any warning by bell, whistle or otherwise that said cars were to be diverted onto said switch track and their course thereby changed from a southerly to an easterly direction, and that assignment of negligence is withdrawn from your consideration."

It will be noted that the foregoing instructions are strictly withdrawal instructions. They make no reference to any facts or circumstances in evidence, do not withdraw any of the evidence in the case from the consideration of the jury, and are not subject to the criticism that they might tend to confuse or mislead the jury with respect to the issues which, under the pleadings and the evidence, were properly submissible to the jury for determination. They merely tell the jury that plaintiff is not entitled to recover upon the first and second assignments of negligence. When several grounds of negligence are alleged in the petition and plaintiff, by his instructions, submits the case to the jury on one of the assignments of negligence only, or upon more than one but omitting therefrom other assignments of negligence made in his petition, he is held to have thereby abandoned the assignments not covered by his instructions, and it is not error for the trial court to refuse withdrawal instructions relating to the assignments of negligence thus abandoned by the plaintiff, as the refusal to give the withdrawal instructions, under such circumstances, "could work no harm" to defendant. [Dietzman v. Screw Co., 300 Mo. 196, 254 S. W. 59; Wallace v. Mfg. Co., 319 Mo. 52, 3 S. W. (2d) 387; Siberell v. Railway Co. 320 Mo. 916, 9 S. W. (2d) 912.] Where, however, plaintiff has enumerated several grounds of negligence in his petition and goes to the jury, as in the instant case, without instructions submitting any specific assignment or assignments of negligence he must be considered as going to the jury on all the assignments of negligence made in his petition, and if the evidence does not sustain all of them it is error to refuse instructions withdrawing from the consideration of the jury those assignments not supported by proof. [Willis v. Applebaum (Mo. App.), 26 S. W. (2d) 823.]

With the situation shown by the evidence to exist in the "Q" yard, i. e., its use as a passageway by defendant's employees and other trainmen, one of the precautions by which defendant might avert injury to persons so using the tracks and yard would be to give warnings of the movement of its trains by bell or whistle with which its engines are equipped. [Beard v. Railway Co., supra.]

The first and second assignments of negligence charge that the defendant failed to exercise this precaution. That a bell or a whistle was not sounded is a negative fact which may be established

by negative evidence. [Stotler v. Railway Co., 200 Mo. 107, 98 S. W. 509.] However, the record in this case supplies no substantial proof of either a positive or negative character supporting the first and second assignments of negligence. Plaintiff (respondent) does not call to our attention any evidence upon which he relies to sustain these assignments, but says in his brief that the "record does not show that the petition was read to the jury, and, therefore it (the record) does not support the contention that harmful error was committed" by refusal of the court to withdraw any of the assignments of negligence from the consideration of the jury. Even though the petition was not read to the jury, yet it is to be assumed that the jury was informed, by opening statement of counsel, of the issues involved and the alleged acts of negligence upon which plaintiff relied. We have searched the record for evidence in support of these assignments and the only evidence which even remotely suggests that it may have related thereto is found in the testimony of the plaintiff as follows:

"Q. From your experience in switching box cars and your experience in working in this particular neighborhood, I will ask you, Mr. Crossno, whether or not there is any noise, or there was any noise, about this time of the evening? A. Yes, sir; there is bound to be noise where there is engines working and cars being moved.

"Q. I will ask you if you can tell, or could have told on this particular evening, just where a certain noise was coming from? A. Why, a noise was coming from the Wiggins side and 'Q' side and all up on the main line of the C. & A. yards.

"Q. Was this noise general? A. Yes, sir; general noise around there.

"Q. Did you see or hear any signal to switch this string of cars? A. No, sir.

"Q. Was the presence of this string of cars communicated to you in any way before you were hit? A. No, sir."

The testimony of a witness whose hearing is unimpaired and who was in such a position and close proximity to a train with nothing interfering to prevent hearing the signals by bell or whistle had they been given, that he did not hear such signals, is competent and substantial evidence on the question of whether resonant signals were given. In the excerpts from plaintiff's testimony which we have above set out as well as in other portions of his testimony he apparently stresses the noise that prevailed, that it was general and was caused by the movement of trains in the "Q" yard and the other near-by yards and main line tracks, in explanation of why he could not and did not hear the approaching train, but adds in the above testimony that no signals were communicated to him. To say that no signals were communicated to him, that is, heard or received by

him, is not the equivalent of testimony showing that his position and the surrounding conditions were such that he could have heard such signals had they been given. This testimony does not justify an inference of fact that resonant signals were not given, but rather discloses that plaintiff was not in a position to have heard and discerned the signals if they were given. It is not evidence of such substantial character as would sustain a verdict for plaintiff on the first and second assignments of negligence, and those assignments of negligence should not have been submitted, as they were, to the jury. The trial court therefore erred in refusing defendant's withdrawal instructions designated "C" and "D."

The judgment is reversed and the cause remanded. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.