**Irene STEELE, Plaintiff-Appellant,**

v.

**Harold V. WOODS, Defendant-Respondent.**

No. 46881.

Supreme Court of Missouri,

Division No. 2.

Sept. 14, 1959.

Galen Knowlton, Thomas M. Howell, Donald E. Raymond, Kansas City, for appellant.

Paul C. Sprinkle, Richard P. Sprinkle, Kansas City, for respondent, Sprinkle, Carter, Sprinkle & Larson, Kansas City, of counsel.

JUSTIN RUARK; Special Judge.

This is a malpractice case. Plaintiff sought and obtained damages because of gangrene and resulting crippling by the loss of her toes and part of her feet following a varicose vein operation. The petition contained numerous charges of negligent and unskillful treatment before, during, and after an operation, including failure to exercise reasonable skill and care such as skillful and careful surgeons are accustomed to use in like operations under like circumstances, negligent failure to employ a method approved and practiced by the members of his profession of like skill, carelessness in performing the operation and in his attendance upon her after the operation, and careless and negligent treatment of plaintiff following an unsuccessful operation.

At the trial the plaintiff expended a great deal of energy and evidence in attempting to prove negligence in failure to make certain proper and necessary preoperative (Trendelenburg) tests in order to determine the sufficiency of plaintiff's inner circulation before operating, and the defendant offered considerable evidence in rebuttal of this accusation. Defendant contended that plaintiff's gangrene and subsequent disability resulted from her refusal to submit to certain postoperative treatment which is referred to as a paravertebral block. At the close of the evidence the defendant was permitted to amend his answer by charging contributory negligence on the part of the plaintiff (among other things) in failing or refusing to have such paravertebral block when it became apparently necessary following the operation. Plaintiff abandoned her theory of negli-

gence in failure to give preoperative tests and submitted her case to the jury upon the theory that, following the operation, plaintiff suffered an impairment of circulation, that a paravertebral nerve block was necessary, that defendant negligently failed to advise the plaintiff of the need for such paravertebral block and that it was not performed. The defendant caused the jury to be instructed on the theory that plaintiff refused to have the nerve block suggested by the defendant and thereby contributed to her own disability. Thus the sole issue which went to the jury was (a) whether the defendant advised a paravertebral nerve block and (b) whether the plaintiff refused to permit it. The plaintiff received a jury verdict for $40,000. Thereafter the court sustained the defendant's motion for judgment after verdict and also sustained defendant's motion for new trial because of deemed error in the giving of plaintiff's instructions 1 and 2. Plaintiff has appealed.

■■ The first and principal question is whether or not the plaintiff made a submissible case. In making such determination we recognize that we are not the judges of the truth or falsity of the testimony. Such determination was the prerogative of the jury. On this appeal we are required to take as true and give the plaintiff the benefit of all favorable evidence and reasonable inferences which may be drawn therefrom, including any evidence introduced by the defendant which is not contrary to her own fundamental theory, and, in general, disregard all evidence which is unfavorable to plaintiff's cause of action.[1] Hence in reciting the facts we take from this voluminous record only those which are favorable to the plaintiff's verdict.

Plaintiff, thirty-three years of age and mother of four children, suffered from a prolapsed uterus. For relief of this condition she was referred to and consulted the defendant, who is a doctor of medicine and a surgeon with his practice "pretty much limited * * * to general surgery." An operation was performed on July 24, and plaintiff was discharged from the hospital on August 1. Plaintiff had also been suffering from varicose veins for some ten years, and when the defendant doctor examined her prior to the pelvic operation this venous condition was discussed. After the operation plaintiff's feet and legs began to swell, and she went back to the doctor. It was decided between them that the varicose veins should be "taken care of," and as a consequence plaintiff went back to the hospital and (on August 24) the defendant performed the operation which was the beginning of the troubles we are now concerned with. This second operation, which was done under general anesthetic, consisted of bilateral high ligations. The great saphenous veins were tied off and the distal ends opened and injected with a drug solution called sodium morrhuate, which is a sclerosing agent. There seems to be little or no contention that the operation itself was not of the character recommended by medical science or that it was not competently done.

When plaintiff was admitted to the hospital for the first (uterus) operation, both she and her husband signed a "consent to treatment and operation" whereby the defendant was authorized to perform all treatments and operations which in the judgment of the physician might be considered to be advisable or necessary. Upon the second entry, however (for the varicose vein operation) the same form of consent was signed by the husband only. There is no explanation in the record as to why the plaintiff did not sign this second authorization.

Almost immediately after recovery from anesthetic given for the venous surgery, the plaintiff began to suffer great pain, which the evidence indicates came at least partially from a lack or impairment of in-

1. York v. Daniels, 241 Mo.App. 809, 259 S.W.2d 109; Fenneren v. Smith, Mo., 316 S.W.2d 602; Peterson v. Tiona, Mo., 292 S.W.2d 581.

ner circulation in the legs and feet. That portion of the hospital records which is entitled "Nurses' Notes" shows that on the morning following the operation "patient's feet continue to be blue, especially the middle toe of the right foot. Complains of numbness and does not feel any pressure when toes are moved. Dr. Woods notified 6:00 a. m. States he possibly could do nothing more."

Plaintiff's legs and feet were "burning up." She said the defendant told her this was because she was allergic to the material injected into her veins. She was given "shots and—[they] started giving me pills along all the time too." She said her legs were unwrapped after three or four days, and when she saw them "they were all blue and purple, platted." Ulcers formed on her legs and later the flesh about her feet began to decay and the bones in one foot became exposed. The nurses' notes from operation date to September 13 mention that plaintiff was frequently crying and in great pain, and this was true occasionally after that time. Various lay witnesses testified to plaintiff's apparent condition during her 69-day stay in the hospital. A sister-in-law who visited plaintiff in the hospital during the week following the operation described plaintiff's feet as black and swollen and one of her legs swollen and with an angry looking sore. She said plaintiff was in misery and wanted her to do something for her. One witness (a patient in the same room August 30 to September 7) described her as "in pain constantly," "she was rolling around in bed," "her feet were black in spots and her toes was all black. They looked like dried up shriveled prunes at the time I first noticed them." By both lay evidence and hospital records, the plaintiff was suffering pain and (eventually) gangrene in both feet and one leg. The defendant advised or left instructions for her to dangle her feet off the bed and to get on her feet. The evidence shows that on one occasion the nurses attempted to get her to walk, that "she would scream with every step,"

and after three or four steps she fainted. The defendant in his testimony describes the plaintiff as "pretty near hysterical at times, in her distress." During this period she was given various drugs. Papaverine, a drug to relieve spasms of the blood vessels, was ordered by the defendant "as needed for pain." The progress record, initialed by the doctor, shows that on September 21 the plaintiff was "still very highly nervous and wants papaverine oftener than scheduled." Other drugs administered were demerol, a pain reliever and anti-spasmodic; empirin compound No. 3, a compound of codein, aspirin, phenacetin, and caffeine; sodium bromide, a sedative; seconal, a barbiturate; and chloral hydrate, a sedative and hypnotic.

On September 25 the "Nurses' Notes" show "debridement of right instep by Dr. Woods." On October 16 the doctor performed a skin graft to the right lower leg and foot and to the left lower leg. Part of the graft "took" and part of it did not. On October 30 the patient was dismissed from the hospital.

Plaintiff testified that "so many things were hazy to me while I was in the hospital that I don't remember a lot that—." Various occurrences she did not recall; some she did. In regard to asking for more narcotics than the doctor ordered, she said, "All I can remember I was in so much pain I asked for it every time I could think of it." She testified she had no recollection of people coming to see her in the hospital. Other witnesses testified to the effect that plaintiff did not realize or recall that she had visitors. The husband testified that she did not remember his being there from day to day; that this condition started shortly after (the operation); that she "got to where she didn't know who I was"; that "there was part of the time she didn't even know I was in the hospital and we didn't discuss nothing"; that part of the time she would know him and part of the time she did not. He placed the period, however, "the biggest part of the time she didn't even know I was there,"

after the first three weeks she was in the hospital, "about three weeks, when it got to the worst." The defendant did not testify in regard to plaintiff's mental condition other than as we have related.

After plaintiff's discharge from the hospital the doctor continued to treat the plaintiff for awhile at his office, which was on the second floor, in Independence. It was necessary for the plaintiff to be driven to this office and carried upstairs. Because of plaintiff's inability to get to his office at times which were convenient to the doctor, the relationship of doctor and patient was terminated and plaintiff went to another physician, who, in December, operated on the plaintiff at another hospital. The gangrenous area in the instep of the right foot was excised. The first and second toes on her left foot were amputated and her left leg (which had become drawn) was gradually straightened by placing it in a bar cast. In 1957 she was again admitted to a hospital because the toes on her right foot had become in a clawed position and were deformed and partially denuded of tissue. All these toes were amputated.

Practically all the medical opinion, including that of the defendant himself, is to the effect that plaintiff's gangrenous condition was the result of a failure or incompetence of the inner circulation; that this was caused by spasms of the blood vessels, and that this in turn was caused by the action of automatic sympathetic nerves which constrict the vessels. Such spasms are not a usual occurrence and are not necessarily to be anticipated. They sometimes result from the trauma or shock of the operation. These spasms can be allayed by the performance of a sympathectomy (cutting of the nerves which control the constricting muscles or sheaths) or a paravertebral block, which consists of injecting the nerves with novocain or other anesthetic agent. The latter is the more con-servative treatment, since its result is only a temporary anesthetization and consequent relaxation of the nerves involved. According to the defendant, the paravertebral block is "the accepted method" of relieving the spasms. "A spasm of her severity, I would say yes. That is the best that you could offer." Defendant's witness Dr. Lapp, a surgeon, testified that when a patient had such spasms he usually used the paravertebral block, that "most certainly it would have a good chance to prevent such things," and that it is the most accepted method of treatment for such spasms and constrictions; that he would advise giving the block as soon as he noticed there was a deficient circulation; that it is impossible to give drugs by mouth which will relieve a spasm in blood vessels affecting a localized leg section; that gangrene occurs from obstruction of the blood supply; that whenever he thought a patient had a deficient blood supply he would try a block as soon as possible. Defendant's witness Graham, a surgeon, testified upon a question hypothesizing the facts of plaintiff's operation and postoperative condition that in his opinion plaintiff had a constriction of the arteries and veins; that as soon as clinical signs arise "one must immediately do a paravertebral block" except when the patient is an older person and very arteriosclerotic; that while there is an element of risk in any operation he would say the block is the only alternative; that as an ordinarily careful and skillful surgeon he would be obligated to explain to the patient the necessity of the treatment, what it consists of, and what the results are likely to be. This witness further testified that the doctor has a duty to tell the patient what treatment is necessary, and that, if necessary treatment was refused, he as a skillful and prudent physician would inform the patient that he was going to make it plain to his colleagues and to the patient's family that the proffered treatment had been refused.[2]

2. The court sustained objection to questions hypothesizing plaintiff's condition (including pain, administration of drugs, etc.) and concerning whether an ordinarily careful and skillful physician and surgeon would, in case of the patient's

In reference to the paravertebral block the plaintiff testified:

"Q. Did you ever have any conversation with Dr. Woods about giving you one of those? A. Not to my knowledge."

On cross-examination:

"Q. Now did Dr. Woods ever try to get you to have a paravertebral block? A. Not to my knowledge, no. sir.

"Q. Well, on the 9th of September, which was some time after the operation, did Dr. Woods suggest to you a paravertebral block and advise it, but you said you didn't want it? A. Not that I know anything about.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Well, you were conscious at all of those times that the doctor asked to have a paravertebral block, were you not? A. I don't remember him ever asking me about a block, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Didn't Dr. Woods explain to you that a paravertebral block would release the spasm around your arteries in your legs and increase your blood circulation? A. No, sir, he didn't.

"Q. You just now say you don't even remember him talking about it? A. I don't remember, so how would I know whether he did or didn't?

"Q. You don't say he didn't do it? A. No, I can't say that he didn't but I don't remember anything about it.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Now you can't remember about any of these requests for paravertebral disks—A. No, sir, I don't—

"Q. Or, paravertebral blocks, I mean. A. No."

The witness also disclaimed any recollection of certain other treatment and other occurrences during the period. She also testified that she had previously had a spinal block (for a coccyx operation) and that there was nothing about it which would have made her not want another one.

The defendant testified that for the first two or three days the patient seemingly progressed all right except that she was complaining of more pain than the usual vein patient complains of, "and it wasn't until a little later on that these areas of discoloration showed up \* \* \* and subsequently broke down"; that as this complication arose he felt that there had been a spasm and that a paravertebral block was necessary; that he desired to do this and "I discussed it, tried to explain it to her, on two or three occasions." "We were in rather desperate straits, and she didn't want it done." He said the gangrene and ulceration did not develop until around the 18th of September.

The hospital records introduced by the plaintiff show:

"9–9—To physiotherapy for whirlpool baths to try to improve circulation and for active and passive exercises. Areas on toes and right leg seem more degenerated. Paravertebral block suggested and advised but patient doesn't want same. H.V.W."

"9–21—Physiotherapy discontinued. Further necrosis with early ulceration at edges of several areas. Advised again to have paravertebral block or possible sympathectomy to help improve circulation. Says she doesn't want any more done. Still very highly nervous

refusal to accept such treatment, attempt to inform the husband or immediate member of the family of the patient's condition and her refusal. Likewise the court sustained objections to the query as to what, under such cir-

cumstances, would be the duty of the physician, and to the question as to whether, in case of refusal, it is the practice to call in a consultant. However, the plaintiff failed to make adequate offer of proof in respect to these rulings.

and wants papaverine oftener than scheduled. H.V.W."

The defendant also testified that he did not make any effort to talk to the husband about the paravertebral block, but that he thought Mrs. Steele wanted to talk to her husband (about it) and "maybe * * * they had a different picture." The husband, who visited the patient at the hospital "about every day," testified that he saw the doctor one time during the period and that was when the (October) skin graft was discussed.

One of respondent's contentions is that the failure to give the paravertebral block was not pleaded and therefore there was no basis for submission on that ground. We have previously set forth certain allegations of the petition which, though general, we believe were sufficient to encompass the charge submitted in the absence of attack on such petition. But aside from that the parties willingly and without objection joined issue and gave battle on the question of whether the paravertebral block was offered and refused. The defendant amended his answer to charge contributory negligence in that respect and thereafter procured an instruction submitting such refusal as contributory negligence. Pleadings are considered as amended to conform to the issues tried by consent of the parties,[3] and we think defendant cannot complain.

Another contention is that the evidence did not show a causal connection between the failure to give the block and the injury which plaintiff suffered. Of course the fact that injury follows negligence does not of and in itself create liability. The burden is on the plaintiff to prove causal connection between the two.[4] And if the injury could reasonably have come from one of several causes, one or more of which is not the fault of the doctor, then any verdict would be based on speculation and surmise.[5] But absolute and mathematical certainty is not required.[6] It is sufficient if there is substantial evidence which shows that the injury is a natural and probable consequence of the negligent act or omission.[7] And this can be determined by reasonable inference from proven facts [8] or circumstantial evidence.[9] Where the logical conclusion from the evidence is that if certain things were properly done certain results would not have occurred, and they *did* occur, the question of causal connection is sufficient to go to the jury.[10]

3. Section 509.500, V.A.M.S.; Kraus v. Kansas City Public Service Co., Mo., 269 S.W.2d 743(6); Biehle v. Frazier, 360 Mo. 1068, 232 S.W.2d 465; Payne v. White, Mo.App., 288 S.W.2d 6, 10; see Telaneus v. Simpson, 321 Mo. 724, 12 S.W.2d 920, 928.

4. Williams v. Chamberlain, Mo., 316 S.W. 2d 505; Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240.

5. Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600; Lappin v. Prebe, 345 Mo. 68, 131 S.W.2d 511; Cardinale v. Kemp, 309 Mo. 241, 274 S.W. 437.

6. 70 C.J.S. Physicians and Surgeons § 62d(1), p. 1003; see Stewart v. Rudner, 349 Mich. 459, 84 N.W.2d 816, 826; Sheffield v. Runner, 163 Cal.App.2d 48, 328 P.2d 828.

7. Scheibe v. Fruin-Colnon Contracting Co., 324 Mo. 375, 23 S.W.2d 44; Davis v. Buck's Stove & Range Co., 329 Mo. 1177, 49 S.W.2d 47; Floyd v. St. Louis Public Service Co., Mo., 280 S.W.2d 74; Dickerson v. St. Louis Public Service Co., 365 Mo. 738, 286 S.W.2d 820; Boyd v. Terminal Railroad Association of St. Louis, Mo., 289 S.W.2d 33, 37, 59 A.L.R. 2d 1222; Craddock v. Greenberg Mercantile, Inc., Mo., 297 S.W.2d 541(2).

8. Snyder v. St. Louis Southwestern Ry. Co., 228 Mo.App. 626, 72 S.W.2d 504, 511; Nevinger v. Haun, 197 Mo.App. 416, 196 S.W. 39, 42.

9. Wright v. Stickler, Mo.App., 96 S.W.2d 932, 938; Eichholz v. Poe, Mo., 217 S.W. 282; Stallman v. Robinson, 364 Mo. 275, 260 S.W.2d 743; see 23 Mo.Law Review 203, 213.

10. Persten v. Chesney, Mo.App., 212 S.W. 2d 469(4); see McDonough v. Freund, 323 Mo. 346, 19 S.W.2d 285; Reed v. Laughlin, 332 Mo. 424, 58 S.W.2d 440; Hester v. Ford, 221 Ala. 592, 130 So. 203.

■ In this case practically all the medical evidence was that the gangrene resulted from impaired circulation; the impaired circulation resulted from spasms; the spasms would probably have been relieved by the blocking off of the involuntary nerves (the paravertebral block), and this was not done. We think this sufficiently established causal connection between the failure to give the block and the injury which plaintiff suffered.

Defendant contends that plaintiff did not make a submissible case on the failure of the defendant to discharge his duty to his patient in failing to advise and give the paravertebral block.

■ The defendant was required to use and exercise that degree of care, skill, and proficiency which is commonly exercised by the ordinarily skillful, careful, and prudent physician and surgeon engaged in similar practice under the same or similar conditions.[11] It is not sufficient that he may have possessed the requisite training and skill; he must also have used and applied it in the treatment of the plaintiff.[12] This duty required that he give heed to plaintiff's symptoms subsequent to the operation and give or prescribe such method of treatment which the situation demanded and as would commend itself to the ordinarily prudent, careful, and skillful physician and surgeon.[13]

■ We think in this case the jury were justified in believing that a paraverte-bral block was necessary to relieve plaintiff's condition and restore the circulation which was necessary to prevent (or treat) gangrene, and they could reasonably have found or inferred that a reasonably careful and skillful physician would have advised and given such block. This was the treatment which defendant himself contends should have been given, and he is supported in this by other eminent physicians. His contention is that such treatment was by him advised and was by plaintiff rejected.

■ Of course the refusal of treatment, after reasonable explanation as to its necessity, by an adult patient who is in possession of her faculties and capable of exercising free judgment in agreeing or refusing, is a complete defense of the doctor who is accused of negligence in not giving the treatment.[14] But whether the treatment was so offered and so refused is a question of fact for the jury.[15]

And this brings us to the hub of the question: was there probative evidence that the paravertebral block was offered and refused? Appellant says that the testimony of plaintiff is an assertion that it was not. Respondent contends that her testimony only indicates a lack of memory as to whether or not the block was offered.

■ Plaintiff, who put the hospital records in evidence, is not "bound" by the statements in such record (placed there by defendant on September 9 and 21) to the

11. 41 Am.Jur., Physicians and Surgeons, sec. 90, p. 208; 70 C.J.S. Physicians and Surgeons § 41, p. 946; Williams v. Chamberlain, Mo., 316 S.W.2d 505, and cases cited at loc. cit. 510; McClarin v. Grenzfelder, 147 Mo.App. 478, 126 S.W. 817, 820; see Rayburn v. Day, 126 Or. 135, 268 P. 1002, 59 A.L.R. 1062; McGulpin v. Bessmer, 241 Iowa 1119, 43 N.W.2d 121.

12. Gunter v. Whitener, Mo.App., 75 S.W. 2d 588; Baird v. National Health Foundation, 235 Mo.App. 594, 144 S.W.2d 850; Sennert v. McKay, Mo., 56 S.W.2d 105.

13. Sibert v. Boger, Mo., 260 S.W.2d 569; Reed v. Laughlin, 332 Mo. 424, 58 S.W. 2d 440, 442; Lewis v. McClellan, Mo. App., 1 S.W.2d 247; Cazzell v. Schofield, 319 Mo. 1169, 8 S.W.2d 580.

14. 70 C.J.S. Physicians and Surgeons § 48g, p. 967, § 51c, p. 974; 41 Am.Jur., Physicians and Surgeons, sec. 108, p. 220, sec. 80, p. 199; 50 A.L.R.2d 1053, annotation; Routt v. Ready, 49 App.D.C. 305, 265 F. 455.

15. Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 141 A.L.R. 1; Summers v. Tarpley, Mo.App., 208 S.W. 266.

effect that a paravertebral block was offered and refused. Having put the record in evidence, plaintiff could not impeach it as such, but she could contradict the facts which were related in such record.[16] But it is suggested that where there are statements favorable to the defendant as to the positive existence of certain affirmative facts which call for a denial or explanation, and the plaintiff is in a position and has opportunity to make such denial or explanation and fails to do so, then the existence of such facts must be assumed to be true in assessing the sufficiency of the evidence;[17] and that the statements by plaintiff that she had no knowledge or recollection of any conversation with the defendant concerning the paravertebral block are simply negative testimony which lacks probative force to establish that such block was not advised, in the face of positive and affirmative evidence that it was so advised.

■■■■■ Of course testimony which in and of itself exposes the lack of knowledge on the part of the witness or shows that it is founded on mere guess must fall of its own weight.[18] But negative testimony is not necessarily lacking in probative force. A negative fact is ordinarily demonstrated by negative evidence, which becomes invested with positive and substantial force when justified by the circumstances.[19] And the words "I don't remember," or "I have no recollection," when coupled with circumstances involving injury, pain, and sedatives, can indi-

cate a lack of comprehension of the thing alleged to have been done while those circumstances existed.[20]

■■■ In order to assess the force and value of any testimony, it may be necessary to look down the mouth of the witness and attempt to see the actual body and shape of the thought which the witness is attempting to express. To do this it is often necessary to keep peripheral understanding and to consider his testimony as a whole, and each expression in relation to the others. The taking of a few isolated words away to themselves and out of context with their surroundings may furnish a distorted, even perjured, conception of the real meaning which the witness is trying to convey. Again, we must consider the circumstances surrounding the occurrences which the witness is trying to describe. Nor is the testimony necessarily to be thrown aside because the witness is cautious and reserved in plucking and displaying the fruits of his memory. Most experienced lawyers and some judges are familiar with the fact that sometimes the loudest and most positive witness is the biggest liar. "It is a commonplace of judicial experience that testimony most glibly delivered and most positively affirmed is not always the most trustworthy. The honest witness who will not exaggerate the strength of his recollection is well worth listening to because of this very caution." Wigmore on Evidence, Vol. III, 3rd ed.,

16. Talley v. Richart, 353 Mo. 912, 185 S.W.2d 23; Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 141 A.L.R. 1; De Lay v. Ward, 364 Mo. 431, 262 S.W. 2d 628; Craddock v. Greenberg Mercantile, Inc., Mo., 297 S.W.2d 541.

17. Spain v. Burch, 169 Mo.App. 94, 154 S.W. 172; Adams v. Othenin's Estate, Mo., 161 S.W.2d 415; Fausette v. Grim, 193 Mo.App. 585, 186 S.W. 1177, 1180; Nevinger v. Haun, 197 Mo.App. 416, 196 S.W. 39, 41; see Russell v. Missouri Ins. Co., Mo.App., 232 S.W.2d 812.

18. Van Bibber v. Swift & Co., 286 Mo. 317, 228 S.W. 69; Globe Automatic Sprinkler

Co. v. Laclede Packing Co., Mo.App., 93 S.W.2d 1053; Barnhart v. Ripka, Mo.App., 297 S.W.2d 787.

19. 32 C.J.S. Evidence § 1037b, p. 1081, et seq.; Chamberlain v. Thompson, Mo., 256 S.W.2d 779, 781; Paisley v. Kansas City Public Service Co., 351 Mo. 468, 173 S.W.2d 33, 37; Crossno v. Terminal R. Ass'n of St. Louis, 328 Mo. 826, 41 S.W. 2d 796(8); Detchemendy v. Wells, Mo. App., 253 S.W. 150.

20. See Smallwood v. St. Louis-San Francisco R. Co., 217 Mo.App. 208, 263 S.W. 550; Edwards v. Morehouse Stave & Mfg. Co., Mo.App., 221 S.W. 744.

sec. 726, p. 58.[21] In this instance the witness had described her condition in respect to suffering and administration of drugs. She had said many things were hazy to her. She disclaimed knowledge of occurrences other than conversations with the defendant and was supported in this by statements of other witnesses. The statements of the defendant himself that he "tried" to explain it to her and that she was "pretty much hysterical at times, in her distress," lend flavor and credence to her contention in this respect. Her reiterated statements that the doctor did not "to my knowledge," "not that I know anything about," "I don't remember him ever asking me about a block" were not expressions indicating guess or complete lack of knowledge but were, we believe, testimony that the doctor never discussed the block with her at any time when she was capable of understanding him. We are of the opinion that the probative effect of her statements in regard to the advising and refusal of this block is somewhere between the extreme contentions of the parties and that the jury could reasonably have believed therefrom that the doctor never discussed a paravertebral block with her at any time or interval when she was so sufficiently in possession of her mental faculties that it reached into her consciousness and understanding, when she knew and understood what he was talking about. Since it was her position that she was, during a portion of the time, not in possession of her faculties and that she did not recall anything during these intervals, any stronger statement, to wit, that the doctor *never* discussed a paravertebral block at *any* time, would have been an arrogant assumption of absolute knowledge in denial of her own evidence in regard to part-time mental insufficiency. Plaintiff was not called upon to deny that which she was helpless to deny because of an unconscious or uncomprehending state. It should require no citation of authority for the proposition that advice to a patient unable to comprehend it is no advice at all. The patient who is charged with contributory negligence is to be charged in the light of what she should have known, and it is the duty of her physician to see that she is fully advised and informed as to the treatment which is necessary.[22] And if the patient is incompetent or incapable of understanding but urgently requires the necessary treatment proffered and the doctor knows or should know of this condition, the duty of the physician to advise the treatment does not necessarily end. Depending upon the circumstances of the case, the seriousness of the need, and the urgency of the situation, perhaps the time or interval of the patient's mental incapacity, the circumstances may require and make it his duty to communicate with and advise the husband or other members of the family who are available and competent to advise with or speak for the patient or take other steps to bring understanding of the need home to the plaintiff.[23] In this case the defendant said that he did not talk with the husband about plaintiff's condition and the need for a paravertebral block, although the husband testified that he was at the hospital almost every day.

■ It is quite true that in a malpractice case which involves the skill and technique exercised by a physician and surgeon

21. See 4 A.L.R. 979, annotation.

22. Everts v. Worrell, 58 Utah 238, 197 P. 1043, 20 N.C.C.A. 849; see Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal.App.2d 560, 317 P.2d 170.

23. We have been unable to find another case which is factually like this one, but advice to or consent by relatives was mentioned, considered or discussed in the following: 70 C.J.S. Physicians and Surgeons § 48h, p. 969; Lester v. Aetna Casualty & Surety Co., 5 Cir., 240 F.2d 676; Fausette v. Grim, 193 Mo.App. 585, 186 S.W. 1177; Wright v. Stickler, Mo. App., 96 S.W.2d 932; Rothe v. Hull, 352 Mo. 926, 180 S.W.2d 7; Barfield v. South Highland Infirmary, 191 Ala. 553, 68 So. 30, 35; Keister v. O'Neil, 59 Cal. App.2d 428, 138 P.2d 723; Pratt v. Davis, 224 Ill. 300, 79 N.E. 562, 7 L.R.A,.N.S,. 609.

it is usually necessary to prove by expert testimony from members of that profession that the skill or technique used did not conform to the standards of the profession.[24] But where the conduct in question does not involve skill or technique in an area where knowledge of such is a peculiar possession of the profession and does involve a matter which any layman (or court) could know, then such "professional" testimony is not necessary.[25] And we think expert testimony is not required in order to establish whether or not a doctor has complied with his duty to communicate the advice of a treatment, admittedly necessary, under a given state of facts.

■ So here we have the proposition from the standpoint of plaintiff's evidence. The treatment was needed; a jury could find that a reasonably careful physician should have advised it. The physician did not advise it at a time when the patient was capable of understanding, remembering, and heeding that advice. This we think is sufficient negative to make a jury issue on the affirmative defense of contributory negligence. But the question is, is it sufficient to make the plaintiff's case in chief? Under this testimony there is an "open end," an *alternative* possibility that the doctor may have (as the plaintiff's hospital records say he did) advised the operation to the patient, who was then incompetent. The doctor would not necessarily and automatically become liable upon the bare fact he had an incompetent patient who refused his treatment, but his duty to advise and treat might extend and require him to make further effort to communicate with the patient at a more propitious time or to communicate with the husband or some one in position of authority, as the circumstances demanded and the opportunity permitted. Is this, the duty which may have arisen under this alternative possibility, sufficiently within the pleadings or issues which were tried as to support the submissibility? This alternative proposition, which really arose with the development of the evidence, is ignored by both the parties here, because they both contend for and tug at the nether ends, i. e., the block was advised and refused— the block was not advised and refused. However, it is such proposition which causes us the most concern. If it is the injection of an entirely new and different violation of duty which was not pleaded or tried by consent, then it was beyond the issues which could have been submitted to the jury. But if the question of duty to take further effort at communication with the patient or to communicate necessity of treatment to some competent person (if available) in position of authority to speak for or advise the incompetent is really a part of the basic duty to communicate the necessity of the treatment, as a matter of fact a part of the treatment itself, then it is not beyond the scope of the issues which the parties tried. We think it was so in this case. Quite obviously the plaintiff was attempting to inquire during the trial of this case concerning such extended or continuing duty in this respect, so it was not foreign to her theory, and we think it is but a natural extension of the issue, which defendant himself contended for and willingly tried, i. e., that the needed treatment was by him advised. We conclude that plaintiff made a submissible case.

■ Plaintiff's verdict-directing instruction in its first paragraph defined rather in the abstract the proper standard of care required of the defendant. In its next paragraph it hypothesized the fact that a paravertebral block was necessary and that the defendant negligently failed to advise the plaintiff of its need. The

24. Williams v. Chamberlain, Mo., 316 S.W. 2d 505, 511; Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600.

25. 70 C.J.S. Physicians and Surgeons § 62d(2), pp. 1006–1009; Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 659, 141 A.L.R. 1; Baird v. National Health Foundation, 235 Mo.App. 594, 144 S.W.2d 850; Seewald v. Gentry, 220 Mo. App. 367, 286 S.W. 445.

instruction wholly ignored the "open end" proposition which we have mentioned. The jury were limited to the question of whether the defendant did, or did not, advise the plaintiff. Perhaps the plaintiff felt that the open end had been closed because the defendant testified he made no effort to talk with the husband. We have said that the jury might have found from all the facts and circumstances which they, the jury, may have believed to exist in this case that this was a failure to exercise the required degree of care and skill, but it was still a question for the jury to determine.[26] Negligence does not become a question of law alone unless the acts upon which its existence depends are of such character that all reasonable men would concur; and where different conclusions can be drawn from the evidence, it is a jury question.[27] It is axiomatic that the verdict-directing instruction must hypothesize all of the elements of plaintiff's case essential to recovery.[28] Furthermore, in the actual hypothesization of facts as presented by the instruction the jury could have believed that if the paravertebral block were necessary, and the defendant failed to advise it, he was, for that reason, negligent. The test in a malpractice case is not just whether the block was *necessary*, but whether a reasonably careful and skillful physician and surgeon would have found it necessary and advised the block, and we believe that this should have carried into the hypothesization of the facts in connection with the statement that the block was in fact necessary. In the treatment of a patient we suspect that, by hindsight, many things can be demonstrated to have been necessary, although such necessity was not so compelling to an able and careful physician at the time, in order to make the physician liable. The jury must find that the failure to recognize such necessity and do something about it was a failure to do that which a reasonably careful, prudent, and skillful physician and surgeon would have done.

We are not sure that we understand plaintiff's definitive instruction No. 2, which commenced with the statement that "the terms 'carelessly and negligently,' as defined elsewhere in these instructions, do not imply lack of caution."[29] We feel that on a retrial of the case the instruction could be drawn so as to express more clearly what the plaintiff intended to convey.

The judgment is reversed in respect to the sustention of the motion for judgment and affirmed in respect to the granting of a new trial, and the cause is remanded for further proceedings.

STORCKMAN, P. J., and EAGER, J., concur.

26. For instance, the jury may have believed or not have believed that the husband was available for consultation. Hoerath v. Sloan's Moving & Storage Co., Mo., 305 S.W.2d 418; State ex rel. and to Use of Hickory County v. Davis, Mo., 302 S.W.2d 892; Hughes v. Aetna Ins. Co., Mo., 261 S.W.2d 942.

27. Wilson v. Wells, 321 Mo. 929, 13 S.W. 2d 541; Hill v. Torrey, Mo.App., 320 S.W.2d 594.

28. Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 300 S.W.2d 490; Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496.

29. Could plaintiff have meant a "lack of skill or capacity" as the instruction was given in Mitchell v. Poole, 229 Mo.App. 1, 68 S.W.2d 833, 840?